**\*FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

## THE HONORABLE FREDA L. WOLFSON
### United States District Judge

_____ :
AMERICAN EXPRESS TRAVEL RELATED       :
SERVICES COMPANY, INC.,               :          **Civil No. 10-4890 (FLW)**
                                      :
                    Plaintiff,        :               **OPINION**
        v.                            :
                                      :
SIDAMON-ERISTOFF, et al.,             :
                                      :
                    Defendants.       :
_____ :

NEW JERSEY RET. MERCH. ASSN.,         :          **Civil No. 10-5059 (FLW)**
                                      :
                    Plaintiff,        :
        v.                            :
                                      :
SIDAMON-ERISTOFF, et al.,             :
                                      :
                    Defendants.       :
_____ :

NEW JERSEY FOOD COUNCIL,              :          **Civil No. 10-5123 (FLW)**
                                      :
                    Plaintiff,        :
        v.                            :
                                      :
STATE OF NEW JERSEY, et al.,          :
                                      :
                    Defendants.       :
_____ :

|  |  |  |
|---|---|---|
| | : | |
| AMER. EXP. PREPAID CARD MGMT. CORP., | : | **Civil No. 10-5206 (FLW)** |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| SIDAMON-ERISTOFF, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

On November 15, 2010,[1] New Jersey's recent amendment to its Unclaimed Property Law, 2010 N.J. Laws Chapter 25 ("Chapter 25" or "the Act"), will take effect.  Chapter 25, inter alia, amends New Jersey's unclaimed property statute, N.J.S.A. 46:30B-1, et seq. ("Unclaimed Property Act"), modifying the presumptive abandonment period for travelers checks from fifteen years to three years, and, for the first time, Chapter 25 provides for the custodial escheat of stored value cards.  See Chapter 25, §§ 2, 5.  Plaintiffs American Express Travel Related Services Company, Inc. ("Amex"), New Jersey Retail Merchants Association ("Retail Merchants"), New Jersey Food Council ("Food Council"), and American Express Prepaid Card Management Corporation ("AMEX Prepaid") (collectively, "Plaintiffs")[2], bring this action to enjoin Defendants Andrew P. Sidamon-Eristoff ("the Treasurer"), Treasurer of the State of New Jersey, Steven R. Harris, Administrator of Unclaimed Property of the State of New Jersey, and the State of New Jersey (collectively,

---

[1]     The amendment was enacted on June 30, 2010, with an initial effective date of July 1, 2010.  The effective date was subsequently extended to November 1, 2010.  To accommodate the proceedings in this case, the State Treasurer extended the implementation date to November 15, 2010.

[2]     Plaintiffs Retail Merchants, Food Council, and AMEX Prepaid, when referred to collectively as issuers of stored value cards ("SVCs") will hereinafter be referred to as "SVC Plaintiffs."

"Defendants," "State of New Jersey" or "State") from enforcing Chapter 25.[3]  In their respective complaints, Plaintiffs raise several constitutional challenges under the doctrines of federal preemption, the Contract Clause, the Takings Clause,  Substantive Due Process, the Commerce Clause, and the Full Faith & Credit Clause.

In the instant matter, Plaintiffs move to preliminarily enjoin Defendants from implementing Chapter 25 during the pendency of these cases.[4]  In response, Defendants oppose the motion and move to dismiss the complaints on the grounds of immunity and abstention.[5]  Because the issues raised by the parties involve similar legal and factual analysis, the Court will address them in this Consolidated Opinion.  For the reasons stated herein, the Court grants in part and denies in part Plaintiffs' requests for a preliminary injunction.  Specifically, the Court enjoins the State of New Jersey from enforcing the place-of-purchase presumption found in Chapter 25 and Guidances issued by the Treasurer.  The Court further enjoins the State from enforcing Chapter 25 retroactively against issuers of stored value cards with existing stored value card contracts that obligate the issuers to redeem the cards solely for merchandise or services.

---

[3]        Several of the Plaintiffs' Complaints initially named the State of New Jersey as a defendant.  The State has subsequently been dismissed by consent of the parties.

[4]        Plaintiff Memo Money Order Company, Inc. ("Memo"), by way Verified Complaint in Civil Action No. 10-5406 (FLW), challenges Chapter 25, which changes the presumptive abandonment period for money orders from seven years to three years.  See Chapter 25, § 3.  Memo also moves for a preliminary injunction.  However, because Memo did not file its Complaint until the day of the Court's hearing on the parties' motions, and did not participate in that hearing, the Court will render a separate opinion on Memo's motion.

[5]        Defendants also moved to dismiss Plaintiffs' complaints for failure to state a claim. However, Defendant has requested the Court to hold that motion in abeyance pending the outcome of Plaintiffs' motions for a preliminary injunction.

## BACKGROUND AND PROCEDURAL HISTORY

Since the parties' motions raise constitutional challenges to Chapter 25, the Court will only recount uncontroverted facts of this case insofar as they provide an understanding of the instant disputes.

## I.    Travelers Cheques by Amex

Amex's Travelers Cheques ("TCs") are preprinted "checks," each bearing a serial number, in fixed amounts, ranging from $20 - $ 100.  Amex is the sole issuer of travelers checks.  On its face, a TC states that it will never expire, and therefore, it is not subject to dormancy charges and, until cashed or used, always retains its full face value.  Amex sells TCs for the face amount without charging any fee.  See Campbell Decl. at ¶¶ 13-16.  When a TC is sold, the seller transmits the funds to Amex, and provides Amex with the serial number of the TC, its amount, and the date and place of the sale, but does not provide the name, address, or any other identifying information about the purchaser.  When Amex sells TCs directly to consumers, it retains only the same information that it receives from third party sellers.  Id. at ¶ 20.

According to Amex, it has been able to sell TCs without charging a fee based on its contractual relationship with TC owners, which gives Amex the right to retain, use and invest funds from the sale of TCs from the date of sale until the date the TCs are cashed or used.  Amex submits that it invests the funds in instruments with varying maturities to obtain the highest yield.  Id. at ¶ 21.  Amex further asserts that it relies on these invested funds, which are integral to the contract between TC and Amex, to remain profitable in the TC business.  Id. at ¶ 21.

Because TCs never expire, Amex maintains that it cannot be relieved of its contractual obligation to honor TCs presented for payment after the amount has been paid as "presumed

4

abandoned" to a state.  In other words, when used, a TC becomes a negotiable instrument, which Amex pays upon presentation regardless of whether it has been paid to the state as unclaimed property.

## II.    Stored Value Cards

SVCs are a relatively recent form of electronic payments.  SVCs come in two varieties: "closed loop" and "open loop" cards.[6]  Closed loop cards may be redeemed only for merchandise or services at and by the retailer who issued the card.  An example of such a card would be a gift card issued by a bookstore and redeemable only at that bookstore for books or other merchandise.  These sorts of cards are issued by members of Plaintiff New Jersey Retail Merchants Association and Plaintiff New Jersey Food Council.  Open loop cards, also referred to as gift cards, may be redeemed at a host of brick-and-mortar and internet-based locations not affiliated with the issuer of the card. "In the current economic climate, stored-value products are particularly important, as they enable the unbanked and underbanked to have access to the payment system and thus to have access to internet transactions."  Juliet M. Moringiello, Survey of the Law of Cyberspace, 65 Bus. Law. 227, 227-28 (2009).  These sort of cards are issued by Plaintiff American Express Prepaid Card Management Corporation.  Happ Decl. at ¶¶ 3-4. While some open loop cards are redeemable for cash, most of the open loop cards issued by AMEX Prepaid are redeemable solely for goods or services.  Id. at ¶6.

Under New Jersey law, gift cards are defined as

---

[6]     There is a third type of SVC—the bank-based prepaid card—which is a prepaid card linked to an account at a depository institution and covered by FDIC insurance.  Sarah Jane Hughes, Federal Payroll, Gift, and Prepaid Card Developments: FDIC Deposit Insurance Eligibility and the Credit Card Act of 2009, 65 Bus. Law. 261, 264 (2009).   None of the Plaintiffs here issue this type of SVC.

a tangible device, whereon is embedded or encoded in an electronic or other format a value issued in exchange for payment, *which promises to provide to the bearer merchandise of equal value to the remaining balance of the device.* "Gift card" does not include a prepaid telecommunications or technology card, prepaid bank card or rewards card;

N.J.S.A. 56:8-110c (emphasis added).  According to Plaintiff Retail Merchants, the funds for gift cards are not necessarily stored on the card itself, but are "held in a bank account maintained by the card issuers."  Rowe Afft. at ¶ 12. Other issuers maintain their gift card balances in a database. Watson Decl. at ¶ 12.  Some issuers issue the cards directly, while others use subsidiaries or cooperatives to issue and process the cards.  "Once the retail gift card is used to make a purchase, each [issuer] recognizes a profit based on the difference between the [issuer's] cost of acquiring the goods or of offering the services, and the retail price paid by the customer to purchase the goods or services."  Rowe Afft. at ¶ 17.

## III.    New Jersey's Unclaimed Property Law

Each of the 50 fifty states, including New Jersey, and the District of Columbia has a set of unclaimed property laws or escheat laws.  These laws require that after property has been deemed "abandoned," the holder of the property, e.g., banks, belonging to a property owner, e.g., consumers, pay that property to the state.  The laws of most states are based upon a version of the Uniform Unclaimed Property Act ("UUPA").  The Court notes that the purpose of enacting these escheat laws is to provide for the safekeeping of abandoned property and then reunite the abandoned property with its owner.  In the usual course, when property is deemed abandoned, the holder of most types of property is required to attempt to contact the owner, using the name and last known address, and if possible, return the property.  If the attempt is unsuccessful, the holder turns over the abandoned

6

property to the state and provides the state with the name and last known address of the owner. Upon such payment, the holder is relieved of any liability to the owner. The state, in turn, makes the effort to reunite the owner with his/her property. New Jersey's Unclaimed Property Act is a custodial escheat statute. That is, when funds are turned over the State, the rightful owner may file a claim to recover the property at any time.

### A.   Travelers Checks

With respect to travelers checks, the issuer, Amex, does not obtain the name or address of purchasers of these checks. Thus, any requirement under state law to send notice to an apparent owner at the last known address before paying such property to the State does not apply to Amex. See N.J.S.A. 46:30B-5. In addition, in New Jersey, travelers checks issuers are exempted from the requirement to include the owner's name and last known address on unclaimed property reports. See N.J.S.A. 46:30B-47. Rather, when travelers checks are sent to the state as unclaimed property, only the serial number, the amount and date of sale are reported. Indeed, New Jersey also exempts travelers checks from being published in a mandated notice by the Treasurer. See N.J.S.A. 46:30B-51, -56. After a travelers check is cashed, Amex determines whether that particular check has been paid to any state as abandoned property. If it has, Amex seeks to reclaim those funds from that state. In New Jersey, while the time for processing such a claim is disputed, it is not disputed that the Treasurer returns the funds with interest.

Each version of the Unclaimed Property Act, enacted in a majority of the states, including New Jersey before the enactment of Chapter 25, includes a 15-year abandonment period for travelers

checks.[7]  However, on June 24, 2010, Bill A3002 was introduced in the New Jersey Legislature. According to the State, the purpose of the bill is "to protect New Jersey consumers from certain commercial dormancy fee practices and to modernize New Jersey's unclaimed property laws."  <u>See</u> Assembly Budget Committee's statement.  The Bill was signed into law six days later.  Importantly, among other provisions, Chapter 25 shortened the abandonment period for travelers checks  from 15 years to 3 years.  <u>See</u> N.J.S.A. 46:30B-11.  After an issuer transfers the presumed abandoned property, that property is administered through New Jersey's unclaimed property system.  The State preserves the property in perpetuity for the owner, <u>see</u> N.J.S.A. 46:30B-9, or for another state that can prove a superior right of escheat.  <u>See</u> N.J.S.A. 46:30B-81.

**B.    Stored Value Cards**

Prior to the recent enactment, gift certificates—the predecessor to stored value cards and gift cards—were not covered by New Jersey's escheat law.  <u>See</u> <u>In re November 8, 1996, Determination of the State of N.J., Dept. of the Treasury, Unclaimed Prop. Office</u>, 309 N.J.Super. 272, 277-79 (App. Div. 1998).  When the Unclaimed Property Act was initially enacted by the New Jersey legislature in 1989, all references to gift certificates were deleted from earlier drafts.  <u>Id.</u> at 276.  This was a departure from the UUPA, which did provide for the escheat of gift certificates.  Under the 1981 UUPA, gift certificates "which remain[ed] unclaimed by the owner for more than 5 years after becoming payable or distributable [were] presumed abandoned."  <u>Id.</u> (citing Section 14 of the 1981 Model Act).  "[T]he  amount presumed abandoned [wa]s the price paid by the purchaser for the gift

---

[7]    Kentucky is another state that shortened the presumptive abandonment period of travelers checks from 15 years to 7 years.  Amex recently successfully challenged Kentucky's statute in federal district court.  <u>See</u> <u>AmEx v. Hollenbach</u>, 597 F.Supp. 2d 717, 722-23 (E.D. Ky. 2009). That decision, which is now on appeal, is discussed in more detail <u>infra</u>.

certificate.  In the case of a credit memo, the amount presumed abandoned [wa]s the amount credited to the recipient of the memo."  Id.

A key reason that gift certificates were not escheated in New Jersey was that they were not redeemable for cash.  As explained by the New Jersey Appellate Division in In re November 8, 1996,

> All of the categories of intangible personal property expressly covered by the New Jersey Act or the 1981 Model Act, are, as a practical matter, claims for the payment of money . . . When any of these claims to the payment of money are transferred to the State, the obligors can readily discharge them by paying the State what they would have paid to the prior owners . . . The issuers of gift certificates, however, frequently do not bind themselves to pay money.

Id. at 276-77.

Chapter 25, thus, changes the legal landscape in New Jersey by providing for the escheat of stored value cards.  There are several components to the statute.  First, it defines stored value cards as

> a record that evidences a promise, made for monetary or other consideration, by the issuer or seller of the record that the owner of the record will be provided, solely or a combination of, merchandise, services, or cash in the value shown in the record, which is pre-funded and the value of which is reduced upon each redemption.

Chapter 25, § 1t (codified at N.J.S.A. 46:30B-6t).  Hence, "stored value cards" include gift cards redeemable only for merchandise or services, as well as cards redeemable solely for cash.[8]  Second,

---

[8]     In terms of the form of the card, the statute provides:
The term "stored value card" includes, but is not limited to the following items: paper gift certificates, records that contain a microprocessor chip, magnetic stripe or other means for the storage of information, gift cards, electronic gift cards, rebate cards, stored-value cards or certificates, store cards, and similar records or cards.  Id.

9

it places stored value cards in the section of the Unclaimed Property Act that addresses credits and overpayments.  That section values credits at 100% face value, stating "in the case of credit balances . . . the amount presumed abandoned is the amount credited to the recipient."  N.J.S.A. 46:30B-43. Third, Chapter 25 bans the imposition of dormancy, inactivity, escheat or similar charges on stored value cards.  Finally, the statute grants the Treasurer authority to grant exemptions to certain classes of businesses based on good cause; the statute does not apply to SVCs issued by issuers that sold less than $250,000 worth of cards in the past year, and the statute does not apply to promotional cards issued in connection with customer loyalty programs.  N.J.S.A. 46:30B-42.1e-f.

The SVC Plaintiffs focus primarily on section 5c of Chapter 25, which amends the Unclaimed Property Act to require issuers to transfer the face value of stored value cards to the State upon the expiration of a two-year abandonment period.  The Act, further, requires issuers to "obtain the name and address of the purchaser or owner . . . and shall, at a minimum, maintain a record of the *zip code* of the owner or purchaser."  Chapter 25, ¶ 5c (emphasis added).  In addition, the Act provides

> [i]f the issuer of a stored value card does not have the *name and address* of the purchaser or owner of the stored value card, the address of the owner or purchaser of the stored value card *shall assume the address of the place where the stored value card was purchased or issued* and shall be reported to New Jersey if the place of business where the stored value card was sold or issued is located in New Jersey.

Id., ¶ 5c (emphasis added); N.J.S.A. 46:30B-42.1c (emphasis added). The Court will refer to this provision as creating a "place of purchase presumption."  As is apparent from its text, the statute makes no mention of the issuer's domicile or state of incorporation in connection with this place of

purchase presumption.[9]

After the statute was enacted, the Treasurer issued several guidances interpreting the statute. Portions of Treasury Guidance dated September 23, 2010, expound upon the place of purchase presumption found in the statute:

> • *If the issuer is domiciled in New Jersey*, any unredeemed balances of stored value cards issued prior to the date of this announcement where the names and addresses or zip code of the purchasers or owners were not recorded *must be reported to New Jersey*.
>
> • *If the issuer is not domiciled in New Jersey*, any unredeemed balances of stored value cards issued prior to the date of this announcement where the names and addresses or zip code of the purchasers or owners were not recorded *should be reported to the state in which the issuer is domiciled* in accordance with that state's unclaimed property laws.
>
> • *If the issuer is not domiciled in New Jersey and the issuer's state of domicile exempts this type of property from its unclaimed property statute*, any unredeemed balances of stored value cards issued prior to the date of this announcement where the names and addresses or zip code of the purchasers or owners were not recorded *must be reported to New Jersey if the cards were issued or sold in New Jersey*. In these instances, the issuer must maintain the address of the business where the stored value card was purchased or issued.

Treasury Guidance dated Sept. 23, 2010 at 3 (emphasis added). As explained in more detail below, Plaintiffs contend that both the statute and the Guidances are unconstitutional.

### C.    Procedural History

Beginning in September 2010, Plaintiffs filed separate complaints alleging that Chapter 25

---

[9]    The Court notes, here, that this provision is related to Plaintiffs' preemption challenge based upon the federal common law established in <u>Texas v. New Jersey</u>, 379 U.S. 674 (1965). As noted <u>infra</u>, the Supreme Court has made clear in the context of this federal common law that the issuer's state of incorporation—not domicile—controls. Because Chapter 25 and Treasury Guidance use the term "domicile," I may refer to the two terms interchangeably in this Opinion.

violated several constitutional provisions and seeking declaratory and injunctive relief. Subsequently, the Court issued Orders to Show Cause as to each of the plaintiff's filing.  In addition to opposing Plaintiffs' motions for injunctive relief, Defendants move to dismiss the complaints on immunity and/or abstention grounds.  On October 21, 2010, the Court held a hearing wherein all parties, except Memo, appeared.[10]  In that hearing, the Court denied Defendants' motion to dismiss based upon immunity and abstention grounds.  In this Consolidated Opinion, the Court addresses Plaintiffs' motions for injunctive relief and renders its written decision on the immunity and abstention issues.

## JURISDICTION

The Court has federal question jurisdiction over this matter, in that Plaintiffs raise constitutional challenges to Chapter 25.  For example, Plaintiffs seeks to enjoin enforcement of Chapter 25, asserting that the Federal CARD Act preempts that law.  Such injunctive relief requests have been held to form the basis for federal question jurisdiction. See Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96 n. 14 (1983) ("A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute [over] which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve."); St. Thomas-St. John Hotel & Tourism Ass'n, Inc. v. Government of U.S. Virgin Islands, 218 F.3d 232, 242 (3d Cir. 2000).

## DISCUSSION

## I.    Sovereign Immunity under the Eleventh Amendment

---

[10]      Memo did not file its Verified Complaint until the day of the hearing.  Therefore, to clarify, the Court's decision made in that hearing does not apply to Memo.

12

The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another state, or by Citizens or Subjects of any Foreign State."  Based on this language, a federal court may not adjudicate a lawsuit brought by a citizen against his own state. Hans v. Louisiana, 134 U.S. 1, 13-14 (1890); Edelman v. Jordan, 415 U.S. 651, 662-63 (1974) ("[T]his Court has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State.").

However, the Eleventh Amendment does not prevent federal courts from hearing all lawsuits involving a state.  It has long been established by the Supreme Court that the Eleventh Amendment does not preclude lawsuits against state officials in their official capacities to enjoin violations of federal law even where the remedy would enjoin enforcement and implementation of an official state policy.  See Ex Parte Young, 209 U.S. 123, 159-60 (1908).  Since Ex Parte Young, the Supreme Court has extended this holding to violations of federal statutes as well as of the United States Constitution. See Green v. Mansour, 474 U.S. 64, 68 (1985); see, e.g., Will v. Michigan Dept. of State Police, 491 U.S. 58, 71, n.10 (1989); Edelman, 415 U.S. at 660; Home Telephone & Telegraph v. Los Angeles, 227 U.S. 278 (1913).   To plead a cause of action under the strictures of Ex parte Young, a plaintiff must establish a present violation of federal law. B.H. Papasan v. Allain, 478 U.S. 265, 278 (1986)(Ex parte Young applies to those cases in which a violation of federal law is ongoing, not to those in which federal law was violated in the past).  Furthermore, only prospective injunctive relief is available under Ex parte Young. See Quern v. Jordan, 440 U.S. 332, 337 (1979); Edelman, 415 U.S. at 677; see also Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess, 297 F.3d 310, 323 (3d Cir. 2002).

13

Defendants claim that although Plaintiffs seek only injunctive relief in this suit, the Eleventh Amendment still bars this action because Plaintiffs seek to divest the State of its special sovereign interest in abandoned property in offense to the "dignity and respect afforded a State." For support, Defendants rely on the Supreme Court's decision in Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261 (1997) and the Third Circuit decision in MCI Telecommunication Corp. v. Bell Atlantic Pennsylvania, 271 F.3d 491 (3d Cir. 2001). In Coeur d'Alene, the Supreme Court held that the Eleventh Amendment barred an Indian tribe's lawsuit in federal court against the state of Idaho which sought to establish the tribe's ownership of submerged lands to which that state claimed title. The Court reasoned that "if the Tribe were to prevail, Idaho's sovereign interest in its lands and waters would be affected in a degree fully as intrusive as almost any conceivable retroactive levy upon funds in its Treasury. Under these particular and special circumstances, we find the Young exception inapplicable." 521 U.S. at 287. After Coeur d'Alene, the Third Circuit, in MCI, explained that the Ex Parte Young doctrine did not apply where a lawsuit affects "a unique or essential attribute of State sovereignty." 271 F.3d at 508. Using the language and holding of these two cases, Defendants cite to historical cases, within and outside the United States, that they contend establishes New Jersey's power to take possession of abandoned chattels as an essential and historical attribute that belongs to the State as a sovereign, and thus, the state officials are immune from this suit. Notwithstanding Defendants' novel assertion in the context of the facts of this case, the authorities on this issue weigh against Defendants' position.

This Court's analysis starts with the Supreme Court's pronouncement in Verizon Maryland Inc. v. Public Serv. Comm'n of Maryland, 535 U.S. 635 (2002). In that case, having reviewed its prior precedent in Coeur d'Alene, the Supreme Court held that when "determining whether the

doctrine of Ex parte Young avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" Id. at 645 (citations omitted).  In that connection, while this Court does not find that Verizon Maryland expressly overruled the consideration of certain unique attributes of state sovereignty imposed by Coeur d'Alene, cases decided since Verizon Maryland, including the Third Circuit, endorse the "straightforward" inquiry when determining whether the Ex Parte Young doctrine applies.  Notably, in Ameritech Corp v. McCann, 295 F. 3d 582, 588 (7th Cir. 2002), the Seventh Circuit expounded:

> [defendant] also suggests that [plaintiff's] lawsuit cannot proceed because it impermissibly burdens the state's sovereign interest in law enforcement. In doing so, [defendant] urges this court--like the district court-- to examine the underlying nature of [plaintiff's] suit and its concomitant impact on the State's sovereign interests. While the Supreme Court in a relatively recent Eleventh Amendment case seemed to advocate this balancing approach, see Coeur d'Alene, 521 U.S. at 267-80 (principal opinion of Kennedy, J., joined by Rehnquist, C. J.), a majority of the Court in [Verizon Maryland] rejected it in favor of the straightforward inquiry described above . . . .  As a result, we need not assess the precise nature of the State's sovereign interest in law enforcement--so long as [plaintiff's] complaint seeks prospective injunctive relief to cure an ongoing violation of federal law, the Eleventh Amendment poses no bar.

Id. at 588; Hill v. Kemp, 478 F.3d 1236, 1259 (10th Cir. 2007), cert. denied, 552 U.S. 1096 (2008)(instructed district courts to "not linger over the question whether 'special' or other sorts of sovereign interests are at stake before analyzing the nature of the relief sought"); see also Pennsylvania Federation of Sportsmen's Clubs, Inc. v. Hess, 297 F.3d 310, 324 (3d Cir. 2002) ("[i]n determining whether the Ex parte Young doctrine avoids an Eleventh Amendment bar, the Supreme Court has made it quite clear that a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized

15

as prospective.'" (quotation omitted)).

Notwithstanding the limited value of Coeur d'Alene, Defendants maintain that based on a state's historical and universal rights towards lands integral to its territory, New Jersey's right to escheat is rooted in aspects of sovereignty tracing back to the ancient times.  Defendants' analogy of a state's power to regulate its territory and its right to escheat abandoned property is inapt. Escheat laws, particularly those relating to intangible property rights, such as the ones at issue in this case, often implicate other states' property rights rather than the interest of one state.  As such, cases addressing the constitutionality of unclaimed property law have rejected the defense of sovereign immunity.  See, e.g., Commonwealth Edison Co. v. Vega, 174 F.3d 870, 871 (7th Cir. 1999) (the Seventh Circuit, citing Coeur d'Alene, rejected an Eleventh Amendment defense to an action against an Illinois state official seeking to enjoin the application of Illinois's Unclaimed Property Act to pension benefits); American Petrofina Co. of Texas v. Nance, 859 F.2d 840, 841 (10th Cir. 1988); AmEx, 597 F.Supp. 2d at 722-23 (Eleventh Amendment did not bar action against Kentucky Treasurer who sought to enjoin enforcement of statute which shortened abandonment period of travelers checks from 15 years to seven years).

Having reviewed the aforementioned cases and their reasoning, the Court rejects Defendants' contention that New Jersey's ability to claim abandoned property and act as its custodian is a unique state sovereignty right deserving of immunity.  The Court does not hold, because it need not, whether there are other essential state sovereign interests that could be afforded immunity by the Eleventh Amendment.  Rather, in this case, the Court does not find that New Jersey's interest in claiming abandoned property rises to the level of unique state sovereignty as proclaimed in Coeur d'Alene. Instead, Plaintiffs' claims satisfy the "straightforward inquiry" because they seek injunctive and

declaratory relief against defendant state officials' enforcement of Chapter 25, which Plaintiffs assert

violates the federal Constitution.  In that regard, Defendants' conduct is ongoing, and Plaintiffs only

seek to have an injunction imposed prospectively.  As such, Defendants are not immune from suit.

## II.   <u>Burford</u> Abstention

Pursuant to the <u>Burford</u> abstention doctrine, Defendants urge the Court to abstain from

hearing the instant suits because timely state court review of Plaintiffs' claims is available, and the

Complaint challenges central components of New Jersey's policy with regard to abandoned property.

Defendants caution that federal review of Plaintiffs' claims will disrupt New Jersey's continued

efforts to integrate Chapter 25 within a policy of protecting unclaimed property.

"The purpose of <u>Burford</u> is to 'avoid federal intrusion into matters of local concern and which

are within the special competence of local courts.'"  <u>Matusow v. Trans-County Title Agency, LLC</u>,

545 F.3d 241, 247-48 (3d Cir. 2008)(quoting <u>Hi Tech Trans, LLC v. New Jersey</u>, 382 F.3d 295,

303-04 (3d Cir. 2004)).  In order to determine whether abstention under <u>Burford</u> is appropriate, the

Third Circuit has instructed courts to employ a "two-step analysis."  <u>Id.</u> (quotations and citations

omitted).  The first consideration is "whether timely and adequate state law review is available." <u>Id.</u>

If such review is available, courts should abstain only if "the case . . . involves difficult questions

of state law impacting on the state's public policy or . . . [the] exercise of jurisdiction would have a

disruptive effect on the state's efforts to establish a coherent public policy on a  matter of important

state concern." <u>Id.</u> (citations and quotations omitted).   Each of these factors need not be present to

warrant abstention. <u>Lac D'Amiante du Quebec, Ltee v. Am. Home Assurance Co.</u>, 864 F.2d 1033,

1043 (3d Cir. 1988).

Plaintiffs argue that this Court should not abstain because this case does not turn on any

question of state law as the claims presented are only federal constitutional claims.  However, as the Third Circuit has made clear, the focus of review is not whether the claims at issue are federal causes of action, but rather, whether the state law or regulation being reviewed involves matters of substantial public concern or whether it is of a complex technical scheme to which Burford is usually applied.  Culinary Serv. of Del. Valley, Inc. v. Borough of Yardley, No. 09-4182, 2010 U.S. App. LEXIS 13485, at *21-22 (3d Cir. Jun. 30, 2010); see Rucci v. Cranberry Twp., 130 Fed. Appx. 572, 578 n.8 (3d Cir. 2005); Chiropractic Am. v. LaVecchia, 180 F.3d 99, 108 (3d Cir. 1999) (the "focus should not be on whether a federal claim has been presented, but rather on the nature of that claim.").  In that regard, the Court will weigh the factors to determine whether abstention is appropriate.

The parties do not dispute that there could be adequate state law review; rather, Plaintiffs argue that there are no difficult questions of state law for the Court to address.  To begin, the Court looks to Burford for guidance.  In Burford, the Supreme Court acknowledged the complexity of the state administrative procedures that were in place to regulate the oil and gas industry in Texas, which it characterized "as [a] thorny problem as [it] has challenged the ingenuity and wisdom of legislatures."  Burford v. Sun Oil Co., 319 U.S. 315, 318 (1943).  Indeed, in the area of gas and drilling, courts unfamiliar with the industry would not be well-equipped to render decisions.  See Mt. Holly Citizens in Action, Inc. v. Township of Mount Holly, No. 08-2584, 2008 U.S. LEXIS 87105, at *26 (D.N.J. Oct. 28, 2008).  On the contrary, Chapter 25 is not difficult to review in the sense that it does not involve complex areas of expertise that should be left to the state.  Instead, reviewing Chapter 25 "merely involve[s] reading and construing a statute, a task for which courts are best equipped."  United Servs. Automobile Ass'n v. Muir, 792 F.2d 356, 365 (3d Cir. 1986) (Burford abstention did not apply because the interpretation of a statute prohibiting certain types of mergers

18

did not require consideration of any other statute, did not require analysis of a complicated regulatory scheme and did not require peculiar local conditions or special expertise). Indeed, Burford abstention has no application when the Court is called upon to interpret an uncomplicated state statute. See, e.g., Mount Holly, 2008 U.S. LEXIS 87105 at *26-27 (finding that interpretation of the New Jersey Constitution, Local Redevelopment and Housing law and Open Public Meetings Act was not so difficult to warrant abstention under Burford); Tillery v. Hayman, 2008 U.S. Dist. LEXIS 41656, at *10-11 (D.N.J. May 28, 2008)(regulatory scheme pertaining to custody in the Management Control Unit was not the sort of complex, technical regulatory scheme to which Burford is usually applied); Matusow, 545 F.3d at 248 (plaintiff's claims of violations of a statute governing title insurance polices and statute governing sheriff sales of property did "not involve any difficult questions of state law or implicate any complex state policies."). Accordingly, because no special expertise is needed in order for the Court to adjudicate the claims in this case and because Chapter 25 does not involve complex intertwined state laws, this factor is not implicated.

Next, Defendants contend that the challenged statute is an integral part of a detailed and exhaustive scheme to protect the interests of the rightful owners of the abandoned property. Notwithstanding Defendants' contention, Plaintiffs' claims do not attack any established New Jersey state policy. In that respect, Plaintiffs do not raise any objections regarding New Jersey's ability to escheat property for the benefit of its citizens. Rather, Plaintiffs challenge New Jersey's attempt to raise its own state revenue by enacting Chapter 25, which Plaintiffs claim runs afoul of the purpose of New Jersey's prior unclaimed property laws - to reunite abandoned property with its rightful owner. Indeed, the claims raised here only challenge the time period, both retroactively and prospectively, for which New Jersey could escheat certain abandoned property, as well as the

additional administrative burden Chapter 25 imposes—these challenges hardly attack a detailed exhaustive policy scheme.  Finally, for abstention purposes, the Court need not decide whether these matters involve substantial public concern.[11]  Because the Court finds that the majority of the abstention factors are not implicated, that is, the claims in this case do not implicate a complex state regulatory scheme or New Jersey's ability to escheat property, abstention is not warranted.

Furthermore, with respect to plaintiffs, Food Council, Retail Association and AMEX Prepaid, an additional consideration for the Court is their claim that to the extent Chapter 25 regulates store valued cards, it is preempted by federal statute.  Courts have held almost uniformly that "abstention is inappropriate when a federal plaintiff asserts a preemption/Supremacy Clause claim."  See, e.g., New Orleans Pub. Serv., Inc., 491 U.S. 350, 362-363 (1989); Kentucky West Va. Gas Co. v. Pennsylvania Pub. Util. Comm'n, 791 F.2d 1111, 1115-1116 (3d Cir. 1986); Middle S. Energy, Inc. v. Arkansas Pub. Serv. Comm'n, 772 F.2d 404, 417 (8th Cir. 1985); Baggett v. Department of Professional Regulation, Bd. of Pilot Commissioners, 717 F.2d 521, 524 (11th Cir. 1983).  This is because "supremacy clause claims are 'essentially ones of federal policy,' so that 'the federal courts are particularly appropriate bodies for the application of preemption principles.'" Kentucky West Va. Gas Co., 791 F.2d at 1115 (quoting Kennecott Corp. v. Smith, 637 F.2d 181, 185 (3d Cir. 1980)).  Although Defendants argue that Plaintiffs' assertion of preemption should be "well-founded" or should raise "substantial questions" of preemption, a reading of the Third Circuit precedent in Kentucky West Virginia Gas Co. does not lead the Court to agree.  To contrary, the circuit court,

---

[11]      On one hand, Defendants submit that Chapter 25 would advance substantial public policy because the State is protecting owners' interests in abandoned property.  On the other hand, Plaintiffs counter that this legislation is simply an unconstitutional attempt at raising state revenue, which is not a matter of substantial public concern.

relying on sister circuit cases, held explicitly that where "Congress has created a statutory scheme . . . which arguably preempts the local regulation complained of, a fundamental element of Burford abstention is thrown into doubt . . . ." Id. at 1116 (emphasis added).  Indeed, the court did not suggest that there must be an initial determination that the preemption claim has substantial merit. Here, Plaintiffs advance that those sections of Chapter 25 that address stored value cards violate the Supremacy Clause because those provisions are preempted by the federal CARD Act – a congressional enactment  specifically regulating stored value cards.  Clearly, Plaintiffs, by having cited a congressional statutory scheme that arguably preempts the State's legislation, have satisfied their burden of showing that Burford abstention does not apply here.  Accordingly, for the reasons already stated, as well as Plaintiffs' assertion of preemption, the Court will not abstain from hearing the merits of Plaintiffs' application for preliminary injunction.

### III.    Standard of Review

Plaintiffs move to preliminarily enjoin the implementation of Chapter 25.  The Third Circuit Court of Appeals has outlined four factors that a court ruling on a motion for a preliminary injunction must consider: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest. Crissman v. Dover Downs Entertainment Inc., 239 F.3d 357, 364 (3d Cir. 2001).  The above factors merely "structure the inquiry" and no one element will necessarily determine the outcome. The court must engage in a delicate balancing of all the elements, and attempt to minimize the probable harm to legally protected interests between the time of the preliminary injunction to the final hearing on the merits. Constructors Association

21

of Western Pa. v. Kreps, 573 F.2d 811, 815 (3d Cir.1978). The movant bears the burden of establishing these elements. Adams v. Freedom Forge Corp., 204 F.3d 475, 486 (3d Cir. 2000).

## IV.    Legal Concepts

### A.    Substantive Due Process

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." The Supreme Court has long held that the clause has a substantive component. See, e.g., Planned Parenthood of S.E. Pennsylvania v. Casey, 505 U.S. 833, 846-47 (1992) ("it is settled that the due process clause of the Fourteenth Amendment applies to matters of substantive law as well as to matters of procedure") (quoting Whitney v. California, 274 U.S. 357, 373 (1927) (Brandeis, J., concurring)). The Third Circuit has explained that substantive due process "is an area of law 'famous for controversy, and not known for its simplicity.'" Nicholas v. Pennsylvania State Univ., 227 F.3d 133, 140 (3d Cir. 2000)(citations omitted). In that connection, the circuit clarified that the substantive due process encompasses at least two very different components. Id.

The first component of substantive due process is implicated when a plaintiff challenges the validity of a legislative act. Id. Typically, "a legislative act will withstand substantive due process challenge if the government 'identifies a legitimate state interest that the legislature could rationally conclude was served by the statute,' although legislative acts that burden certain 'fundamental' rights may be subject to stricter scrutiny." Id. (quotations and citations omitted); see Alexander v. Whitman, 114 F.3d 1392, 1403 (3d Cir. 1997). The second component, which is not implicated in this case, protects against certain types of non-legislative state action. To prevail on this claim, a plaintiff must first establish as a "threshold matter that [it] has a protected property interest to which

22

Fourteenth Amendment's due process applies."   Woodwind Estates, Ltd. v. Gretkowski, 205 F.3d 118, 123 (3d Cir. 2000).   Here, Plaintiffs challenge the validity of Chapter 25 under the first component of substantive due process, and as such, the Court's discussion will be confined to this issue.

The first step in any substantive due process analysis is to determine the standard of review. "The choice of a standard of review . . . turns on whether a 'fundamental right' is implicated." Sammon v. New Jersey Bd. of Medical Examiners, 66 F.3d 639, 644 (3d Cir. 1995) (citations omitted).  Here, the parties do not dispute that the rational basis test applies in this case.

Where rational basis review is appropriate, "a statute withstands a substantive due process challenge if the state identifies a legitimate state interest that the legislature rationally could conclude was served by the statute." Id.  In determining whether a law comports with substantive due process, the inquiry is whether the law is rationally related to a legitimate state interest.  Rogin v. Bensalem Township, 616 F.2d 680 (3d Cir. 1980), cert. denied, 450 U.S. 1029 (1981).  "The law need not be in every respect consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it."  616 F.2d at 689 (quoting Williamson v. Lee Optical of Oklahoma, Inc., 348 U.S. 483, 487-88 (1955)); see also Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 682 (3d Cir. 1991), cert. denied, 503 U.S. 984 (1992).

The Third Circuit has repeatedly cautioned that a court engaging in rational basis review is not entitled "to second guess the legislature on the factual assumptions or policy considerations underlying the statute. If the legislature has assumed that people will react to the statute in a given way or that it will serve the desired goal, the court is not authorized to determine whether people

23

have reacted in the way predicted or whether the desired goal has been served." Sammon, 66 F.3d at 645. The sole question is "whether the legislature rationally might have believed the predicted reaction would occur or that the desired end would be served." Id. When legislation is being tested under rational basis review, "'those challenging the legislative judgment must convince the court that the legislative facts on which the classification [of the statute] is apparently based could not reasonably be conceived as true by the governmental decisionmaker.'" Id. (quoting Vance v. Bradley, 440 U.S. 93, 111 (1979)); see also Pace Resources, Inc. v. Shrewsbury Township, 808 F.2d 1023, 1034-35 (3d Cir.), cert. denied, 482 U.S. 906 (1987).

Indeed, "those attacking the rationality of the legislative classification have the burden 'to negat[e] every conceivable basis which might support it.'" FCC v. Beach Communications, Inc., 508 U.S. 307, 315 (1993) (quoting Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364 (1973)); see, e.g., Heller v. Doe, 509 U.S. 312, 319-20 (1993) (finding that laws scrutinized under rational basis review are "accorded a strong presumption of validity"); Hodel v. Indiana, 452 U.S. 314, 331-32 (1981). Ordinarily, that burden is insurmountable. "[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality.'" Heller, 509 U.S. at 321 (internal quotations and citations omitted).

Importantly, a state need not provide justification or rationale for its legislative decision. Indeed, the Supreme Court has held that "legislative choice[s] [are] not subject to court factfinding and may be based on rational speculation unsupported by evidence or empirical data." Beach Communications, 508 U.S. at 315l; see Merrifield v. Lockyer, 547 F.3d 978, 989 (9th Cir. 2008)

24

(state action survives rational basis review if "there is any reasonably conceivable [set]of facts that could provide a rational basis for the challenged law" (quoting Beach Communications, 508 U.S. at 313 (internal quotation marks omitted))).   The rationale for such a deferential standard is that the legislative process will, from time to time, yield imperfect results, but "[o]nly by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function." Lehnhausen, 410 U.S. at 365 (quoting Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 510 (1937)).   Nevertheless, the rational basis test is not a "toothless" one, Mathews v. Lucas, 427 U.S. 495, 510 (1976), and "it is the function of courts . . . to determine in each case whether circumstances vindicate the challenged regulation as a reasonable exertion of governmental authority or condemn it as arbitrary or discriminatory." Nebbia v. New York, 291 U.S. 502, 536 (1934).

**B.     Contract Clause**

The Contracts Clause, found in Article I, § 10, of the Constitution, states that "No State shall ... pass any ... Law impairing the Obligation of Contracts."   To ascertain whether there has been a Contract Clause violation, through retroactive application or otherwise, a court must first inquire whether the change in state law has "operated as a substantial impairment of a contractual relationship." General Motors v. Romein, 503 U.S. 181, 186 (1992) (citations omitted)(emphasis added); Nieves v. Hess Oil Virgin Islands Corp., 819 F.2d 1237, 1243 (3d Cir. 1987); Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 411 (1983).

> In determining the degree to which an obligation has been impaired, one must be mindful that the Contracts Clause is designed to "enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to

rely on them." The obligations protected by the clause "include [ ] not only the express terms [of the contract] but also the contemporaneous state law pertaining to interpretation and enforcement."

Legal Asset Funding, LLC v. Travelers Cas. & Sur. Co., 155 F.Supp. 2d 90, 99 (D.N.J. 2001) (quoting United States Trust Co. v. New Jersey, 431 U.S. 1, 19-20 n. 17 (1977)).  See also Transport Workers Union of America, Local 290 By and Through Fabio v. Southeastern Pennsylvania Transp., 145 F.3d 619, 621 (3d Cir. 1998).  Thus, in sum, the "Contract Clause analysis requires three threshold inquiries: (1) whether there is a contractual relationship; (2) whether a change in a law has impaired that contractual relationship; and (3) whether the impairment is substantial." Transport Workers, 145 F.3d at 621.

If the court concludes that the challenged act works a substantial impairment, the court must then engage in a careful examination of "whether the law at issue has a legitimate and important public purpose."  Id.  Finally, the court must consider "whether the adjustment of the rights of the parties to the contractual relationship was reasonable and appropriate in light of that purpose."  Id.; West Indian Co., Ltd. v. Government of Virgin Islands, 844 F.2d 1007, 1021 (3d Cir. 1988) ("Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'" (quoting Energy Reserves Group, 459 U.S. at 411-12)).  That determination will necessarily depend upon whether the state is a party to the contract at issue.  If it is not, "'as is customary in reviewing economic and social regulation, . . . courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.'" Energy Reserves, 459 U.S. at 412-13 (quoting United States Trust, 431 U.S. at 22-23).  If the state is a party to the contract, such deference is

26

inappropriate, and the court may inquire whether a less drastic alteration of contract rights could achieve the same purpose and whether the law is reasonable in light of changed circumstances. United States Trust, 431 U.S. at 25-26, 30-32.  Generally, the standard of review applied to the court's review of the legislature's interests is more exacting than rational basis.  See Legal Asset, 155 F.Supp.2d at 100-01 (citing Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717, 733 (1984)); Mercado-Boneta v. Administracion del Fondo de Compensacion al Paciete Through Ins. Com'r of Puerto Rico, 125 F.3d 9, 12 (1st Cir. 1997) ("This inquiry is more searching than the rational basis review employed in Due Process or Equal Protection analysis. Although deference is due to the legislature, and weight is given to the legislature's own statement of purposes for the law, a court must undertake its own independent inquiry to determine the reasonableness of the law and the importance of the purpose behind it.").

## C.     Takings Clause

The Takings Clause prohibits states from taking private property for public use without just compensation.  U.S. Const. Amend. V, XIV;  County Concrete Corp. v. Town of Roxbury, 442 F.3d 159, 164 (3d Cir. 2006) (citing Cowell v. Palmer Twp., 263 F.3d 286, 290 (3d Cir. 2001)).  To succeed on a takings claim, a plaintiff must . . . demonstrate that the state's action affected its "legally cognizable property interest." Prometheus Radio Project v. F.C.C., 373 F.3d 372, 428 (3d Cir. 2004) (citing  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985) and Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 160-61 (1980)).

There is no "set formula' for determining when governmental action constitutes a taking ...." State of New Jersey v U.S., 91 F.3d 463, 468 (3d Cir. 1996) (quoting Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 123 (1978).  To the contrary, courts must engage in a factual inquiry

to determine whether a taking has been effected.  In ascertaining whether a taking has affected a property interest, "[r]elevant considerations include the economic impact of the regulation on the claimant and . . . the extent to which the regulation has interfered with distinct investment-backed expectations."  Id. (quoting Penn Cent., 438 U.S. at 124) (alterations in text omitted).  The nature of the action is another relevant consideration.  While "a physical invasion of land [is] more likely to constitute a taking, . . . a public program adjusting the benefits and burdens of economic life to promote the common good, . . . ordinarily will not be compensable."  Id.

Hence, it is not enough that an enactment "adversely affect recognized economic values." Id. The enactment must "interfere with interests that were sufficiently bound up with the reasonable expectations of the claimant to constitute 'property' for Fifth Amendment purposes."  Id.  Thus, legislation that prohibits the most beneficial use of property or even precludes an individual from operating his business does not necessarily violate the clause.  Penn Cent., 438 U.S. at 125-27.  This is true whether or not the individual suffers substantial economic harm.  Id. at 125.

Where a taking has been effected, the Takings Clause does not prohibit the taking altogether, but merely requires that there be a "public purpose" for it,  and that "just compensation" be paid. RLR Investments, LLC v. Town of Kearny, Civ. Action No. 09-3100, 2010 WL 2650478, *2 (3d Cir. Jul. 2, 2010).  In terms of public purpose, "[s]tate legislatures have 'broad latitude in determining what public needs justify the use of the takings power,' Id. (quoting Kelo v. City of New London, 545 U.S. 469, 483 (2005)), and courts give 'great respect' to those determinations."  Id. (citation omitted).  In short, a taking is effected for a public use "'where the exercise of the eminent domain power is rationally related to a conceivable public purpose.'"  Id. (quoting Hawaii Housing Auth. v. Midkiff, 467 U.S. 229, 241 (1984)).

28

Moreover, courts equate the public use requirement as "coterminous with the scope of a sovereign's police powers." Carole Media LLC v. New Jersey Transit Corp., 550 F.3d 302, 307 (3d Cir. 2008). A taking effected for a purely private purpose or under the pretext of a public purpose would not withstand constitutional scrutiny. Id. at 309. However, "that a taking creates incidental benefits for individual private parties does not condemn that taking as having only a private purpose." Id. (internal quotation mark and citation omitted). So, for example, economic regulation that effects a taking in order to encourage revitalization is a public use under the Takings Clause. Id. at 310. That a state legislature may also have revenue raising as one of its motives in enacting the challenged legislation does not render a taking unconstitutional. Id.

In the escheat context, several cases find no Takings Clause violation based on a state's retention of interest earned on the abandoned property while held in state custody. See Simon v. Weissman, 301 Fed.Appx. 107, 113 (3d Cir. 2008) (collecting cases). By way of example, the Seventh Circuit in In re Folding Carton Antitrust Litigation, 744 F.2d 1252 (7th Cir. 1984), rejected an owner-asserted takings claim, reasoning:

> Since any legitimate claimant has been afforded an adequate remedy against the United States, there is no bar to interim governmental use of the escheated money deposited in the Treasury and to the credit of the United States.

Id. at 1255 (internal quotation marks omitted). These sorts of cases rely upon the Supreme Court's rationale in Texaco, Inc. v. Short, 454 U.S. 516 (1982), that "[i]t is the owner's failure to make any use of the property— and not the action of the State—that causes the lapse of the property right; there is no 'taking' that requires compensation." Texaco, 454 U.S. at 529. In other words, an owner that abandoned its property, also abandons his or her right to earn interest on that property while in

state custody.  Simon, 301 Fed. Appx. at 112.  Obviously, these cases focus on the owner of the property – not the debtor.

    **D.**    **Retroactivity**

    The parties have all raised the question of retroactive application of Chapter 25 in their briefing.  The retroactive application of statutes is affected by several constitutional provisions, and some aspects of state law.

> Generally, courts favor prospective application of statutes. Fundamental fairness suggests that government give prior notice of a statute so citizens may conform their behavior before its enforcement. Retroactive application also tends to disturb feelings of security in past transactions. Moreover, retroactive application of a statute may implicate due process rights.

Twiss v. State, Dept. of Treasury, 124 N.J. 461, 466 (1991) (internal quotation marks and citations omitted).  See also Unity Real Estate Co. v. Hudson, 178 F.3d 649, 659 (3d Cir. 1999) ("[O]ur legal system has a long-standing and well-justified distaste for retroactive laws, because of their heightened potential for unfairness."(citation omitted)).

    Where it is clear that the legislature intended to apply a statute retroactively, however, the only question before a reviewing court is whether retroactive application is prohibited by a specific constitutional provision.  See In re Minarik, 166 F.3d 591, 596, 596 n.1 (3d Cir. 1999).  While the record before the Court suggests that the retroactive application of Chapter 25 will work create an onerous administrative burden for Plaintiffs, nonetheless, my discussion of Chapter 25's retroactive application is limited only to whether the statute violates the challenged constitutional provisions.

**V.**    **Likelihood of Success**

    Because much of the parties' dispute centers around the likelihood of success of Plaintiffs'

claims, the Court first focuses on this factor.

### A.   Travelers Checks

#### 1.   Substantive Due Process

Amex claims that Defendants can identify no legitimate state interest which would justify the violation of Amex's rights to invest the proceeds from the sale of travelers checks. Rather, Amex submits that New Jersey's primary purpose for shortening the abandonment period is to raise revenue for the State, which Amex vehemently contends does not pass constitutional muster. Indeed, in response, Defendants advance several rationales for the enactment of Chapter 25 which they contend comport with substantive due process. First, Defendants explain that the New Jersey Legislature could have concluded that establishing greater consistency and uniformity in the presumptions of abandonment for various forms of intangible property was crucial to modernizing the State's unclaimed property laws. Defendants also advance that shortening the time period would confer greater protection for New Jersey property owners, in that Chapter 25 would protect owners from losing their rights to their property. Moreover, Chapter 25, as Defendants claim, would protect property owners from the uncertainty of the economy in the event that a company, like Amex, declares bankruptcy and would be unable to pay the sum due on a traveler's check.

Affording Defendants great deference and the presumption of validity under the rational basis review, as this Court must, the Court finds that Amex has failed to demonstrate a reasonable likelihood of success on its substantive due process argument. Because on this motion it is Amex's burden to establish a likelihood of success, the Court will address each of Amex's contentions. Amex focuses on the stated purposes of Chapter 25, which according to the State's Assembly Budget Committee are "to protect New Jersey consumers from certain commercial dormancy fee practices

31

and modernize the State's unclaimed property laws." Budget Comm. Statement, p. 1.  As there are no dormancy fees associated with travelers checks, Amex argues that Chapter 25's only other stated aim – to "modernize" the Unclaimed Property Act with respect to travelers checks – is irrational.

First, Amex points out that there is no evidence to suggest that a three-year period before abandonment bears any rational relation to the actual abandonment of travelers checks since over 90% of the checks sold in New Jersey that are uncashed three years after sale will be cashed within fifteen years - the current abandonment period.  See Campbell Decl. at ¶ 6.  Essentially, Amex argues that because the vast majority of the travelers checks are used before the fifteen-year abandonment period, it is irrational for New Jersey to presume that those checks have been abandoned only after three years.  However, from a statistical standpoint, the record before the Court reveals that more than 96% of travelers checks sold in New Jersey in a given year are likely to be redeemed within a three year period.  Helms Decl. at ¶ 9.  Therefore, it would not be irrational for the Legislature to have determined that the small percentage of the unclaimed three-year old travelers checks are presumed abandoned.  In fact, the shortened abandonment period reflects consumers' actual timing of redemption for travelers checks in this State.  Regardless, it is not the Court's role to inject mathematical precision into the Legislature's decisions.  Heller, 509 U.S. at 321.  Indeed, "legislative choice[s] [are] not subject to court factfinding and may be based on rational speculation unsupported by evidence or empirical data."  Beach Communications, 508 U.S. at 315l.

Next, Amex argues that without the names and addresses of travelers checks owners, the change in the abandonment period does not advance the purpose of New Jersey's Unclaimed Property Law, which is to reunite the property with its rightful owner.  To properly address this issue, a discussion of the purpose and the application of the Act is necessary.  Under the Act, "the State

takes custody of the property and has full use of it and has full use of [the funds] until the rightful

owner comes forward to claim it. Clymer v. Summit Bancorp., 171 N.J. 57, 63 (2002). In Clymer,

the New Jersey Supreme Court expounded:

> Regardless of the applicable dormancy period, once turned over to the
> Treasurer, title to the unclaimed property does not vest in the State but remains
> in the owner, as the State only assumes custody of the intangible property until
> the owner or his or her successors assert a claim that is verified and allowed.
> In the meantime, the property is placed in the Unclaimed Personal Property
> Trust Fund and the Treasurer has the discretion to transfer a percentage of these
> funds to the State Treasury's General Fund. N.J.S.A. 46:30B-74. Seventy-five
> percent of all proceeds from property received by the State (except abandoned
> child support funds) is transferred from the unclaimed property trust funds to
> the General State Fund; the balance is used to pay claims of persons who
> establish their ownership of the presumptively abandoned property in the
> State's custody. Id.
>
> Thus, all unclaimed funds are held by the Treasurer as trustee for the public
> interest. Notice is published in newspapers of general circulation listing the
> missing owners. N.J.S.A. 46:30B-51. A person may make a claim to the
> property at any time in perpetuity. N.J.S.A. 46:30B-77. Notably, when a claim
> is verified and paid, the Treasurer pays interest for the period during which the
> monies were in state custody. N.J.S.A. 46:30B-79. By the same token, upon
> delivery of the unclaimed property to the Treasurer, a holder is fully and
> unconditionally relieved of all liability concerning the property. N.J.S.A.
> 46:30B-61. If some party thereafter claims the fund by an action against the
> former holder, the State will defend the holder against the claim and indemnify
> the holder against liability. N.J.S.A. 46:30B-65.

Id. at 63-64 (quoting Clymer v. Summit Bancorp., 320 N.J. Super. 90, 98-99 (Ch. Div. 1998)).

Moreover, "the public policy of the State is in favor of the custodial taking of abandoned or

unclaimed property by the State Treasurer . . . . [B]ecause of the remedial effect of the custodial

scheme, the prevailing custodial statutes have been given a liberal interpretation in favor of the State

and as to the position of any stakeholder or obligor."  Id. at 67 (quoting Safane v. Cliffside Park

Borough, 5 N.J. Tax 82, 88 (1982) (internal citations omitted)).

33

Here, by arguing that the State has insufficient information to reunite owners with their unclaimed travelers checks, Amex is impermissibly challenging New Jersey's general right to escheat travelers checks because the abandonment period is irrelevant to whether the State has possession of the names and address of the owners. Stated differently, if the State does not have any information pertaining to the travelers checks at the three-year period, it certainly would not have any more information after fifteen years. Therefore, the ability of the State to reunite the abandoned property at three years or fifteen years is directly dependent upon the information provided by the holder, or Amex, in this case.

Indeed, on this motion, Amex has not provided sufficient information for the Court to determine how the transfer of unclaimed travelers checks to the State will in fact occur, and thus, whether the State will have sufficient information to be able to reunite the unclaimed checks with their rightful owners. Regardless, the ability of the State to reunite property with its owner has little bearing on the time frame when the State determines to escheat. Rather, as declared by the New Jersey Supreme Court, the Unclaimed Property Act is remedial legislation which should be given a liberal construction in favor of protecting property owners. Therefore, since the State's ability to escheat is rooted in consumer protection, the State is a better custodian for abandoned property than any private holder. Accordingly, Amex's argument in this respect also fails to show how it would succeed on its substantive due process claim.

Likewise, the Court does not find that Amex will succeed with its contention that the enactment of Chapter 25 fails the rational basis test because it serves as a revenue generating measure for New Jersey. In support of its argument, Amex cites extensively to Hollenbach, wherein the district court struck down a Kentucky statute that shortened the presumptive abandonment period

for travelers checks to seven years.  Id.  Specifically, the court there found on a summary judgment motion that, because the state legislature enacted the abandoned property law as an effort to raise revenue, "[c]omplete deference to a legislative assessment of reasonableness and necessity is not appropriate [where] the State's self-interest is at stake."  Hollenbach, 630 F. Supp. at 763.  The Kentucky court relied upon  U.S. Trust Co. of New York v. New Jersey, 431 U.S. 1, 25-26 (1977), for its determination.  However, that Supreme Court case dealt with Contract Clause allegations where a state itself is a contracting party.  This Court finds no basis to import the heightened scrutiny standard, delineated in U.S. Trust Co., to the substantive due process claim here.  Moreover, the Hollenbach court found conclusively that the only reason the legislature in Kentucky passed the measure to shorten the presumptive abandonment period for travelers checks was to raise revenue.  Hollenbach, 630 F.Supp. 2d at 764.  On the other hand, in this case, while revenue raising appears to have been a consideration in enacting Chapter 25, it was not the only conceivable basis.

Furthermore, as stated previously, by operation of law, the State enjoys the right to transfer a percentage of unclaimed property into the General State Fund, and that fund is held in a fiduciary capacity with interest accruing to the rightful owner.  While Amex acknowledges that it uses the purchaser's property for its own private gain until the checks are redeemed, the difference is that the State holds and uses the money for the public's interest.  As the Supreme Court has explained, when states serve as custodians of abandoned property, "[s]uch property thus escapes seizure by would-be possessors and is used for the general good rather than for the chance enrichment of particular individuals or organizations."    Standard Oil v. New Jersey, 341 U.S. 428, 436 (1951); Commonwealth of Mass. v. FDIC, 102 F.3d 615, 618 (1st Cir. 1996)(Massachusetts' abandoned property laws "enacted both to protect the rights of the true owners when and if they appear and to

bring additional revenues to the Commonwealth's treasury"); Travelers Express Co. v. Minnesota, 664 F.2d 691, 695 (8th Cir. 1981)(preference established in Uniform Act for Disposition of Unclaimed Property for "adopting state's use of the unclaimed fund over possession by the fortuitous holder").  Accordingly, the mere fact that New Jersey generates revenue by escheating abandoned property does not run afoul of any substantive due process safeguards.[12]

Finally, Amex argues that because New Jersey's Money Transmitter law, N.J.S.A. 17:15C-2, et seq., requires Amex to invest the proceeds from the sale of travelers checks in a safe and secure permissible investment, there is no rational basis upon which the Legislature could have concluded that it needed to seize the uncashed checks in order to protect consumers.[13]  In this argument, Amex

---

[12]    Amex further suggests that the shortened abandonment period in Chapter 25 will not raise any revenue for the state.  It reasons that because 90% of the uncashed travelers checks after three years will be cashed before the 15-year mark, and 80% will be cashed thereafter, it would be neither "prudent" nor "advisable" for Defendants to transfer any but a minute percentage of the additional funds received as a result of Chapter 25 to the General Fund, and transferring more than a minute amount, Amex argues, would be a violation of N.J.S.A. 46:30B-74.  The Court refuses to determine as a constitutional issue how the State will allocate its funds; that determination is not properly before the Court.  Moreover, whether the State will generate revenue from escheating travelers checks is irrelevant to the Court's rational basis review.  Instead, the Court's focus is whether there is a rational basis in enacting Chapter 25.

[13]    The NJ Money Transmitter Law defines "money transmitter" as

Money transmitter" means a person who engages in this State in the business of:
(1) the sale or issuance of payment instruments for a fee, commission or other benefit;
(2) the receipt of money for transmission or transmitting money within the United States or to locations abroad by any and all means, including but not limited to payment instrument, wire, facsimile, electronic transfer, or otherwise for a fee, commission or other benefit; or
(3) the receipt of money for obligors for the purpose of paying obligors' bills, invoices or accounts for a fee, commission or other benefit paid by the obligor.

N.J.S.A. 17:15C-2. The statute defines "payment instrument" as:

any check, draft, money order, travelers check or other instrument or written order for the transmission or payment of money, sold or issued to one or more persons, whether or not the

invites the Court to second-guess the Legislature's decision to provide broader protection for the State's consumers by pointing to a statutory scheme that also provides consumer protection. The Court does not find that the Money Transmitter Statute negates the State's effort of affording broader protection to property owners by enacting Chapter 25. Indeed, according to Defendants, the regulatory and licensing provisions under the Money Transmitter Statute do not fully eliminate the risks and concerns of a holder's financial status. It is therefore rational for the Legislature to

---

instrument is negotiable.

N.J.S.A. 17:15C-2. The statute requires that funds equal to the full outstanding balance of travelers checks sold be invested in "permissible investments":

a. Each licensee shall at all times possess a surety bond, irrevocable letter of credit or such other similar security device acceptable to the commissioner in the amount required pursuant to section 8 of this act.

b. Each licensee shall at all times possess permissible investments having an aggregate market value, calculated in accordance with generally accepted accounting principles, of not less than the aggregate face amount of all outstanding payment instruments issued or sold by the licensee in the United States. This requirement may be waived by the commissioner if the dollar volume of a licensee's outstanding payment instruments does not exceed the bond or other security devices posted by the licensee pursuant to section 8 of this act.

c. In the event of bankruptcy of the licensee, permissible investments, even if commingled with other assets of the licensee, shall be deemed to be held in trust for the benefit of the purchasers and holders of the licensee's outstanding payment instruments by operation of law.

N.J.S.A. 17:15C-6. Under the statute, "permissible investments" include cash, certificates of deposit, bills of exchange, any investment which is rated in one of the three highest rating categories, investment securities, shares in a money market mutual fund, demand borrowing agreements made to a corporation, receivables which are due to a licensee from its authorized delegates pursuant to a contract and any other investments authorized by the commissioner. See N.J.S.A. 1715C-2.

determine that by shortening the presumptive abandonment period consumers would be better protected.

Amex submits that, if the State is permitted to shorten the presumptive abandonment period, it may cease selling travelers checks in New Jersey in light of the sharp decrease in profits that it will suffer. In Amex's view, Chapter 25 was enacted for the sole purpose of raising revenue for the State at Amex's expense. Based on the record before the Court and the lack of legislative history, it appears that a primary aim of Chapter 25 was to increase the State's coffers. While the Court finds the purpose troubling, especially as compared to the conventional purpose of escheat legislation, which is to reunite owners with their abandoned property, nonetheless, so long as revenue raising was not the only basis for this legislation, it is not the Court's role to decide whether the Legislature's judgment is sound. Rather, the Court's substantive due process inquiry is limited to whether the State has put forth a *conceivable* rational basis for its action. The Court has already so found in this Opinion. Thus, having considered Amex's arguments, the Court does not find that Amex has established a likelihood of success on its substantive due process claim.

### 2.    Contract Clause

Similarly, Amex has failed to show a likelihood of success with respect to its Contract Clause claim. Amex submits that it has a binding contractual relationship with its purchasers, and that relationship provides a contractual right for Amex to invest the proceeds from the sale of the travelers checks from the date of sale until the travelers checks are cashed, or under the current law, until the checks are escheated by the State in fifteen years. In that respect, Amex argues that the 15-year abandonment period is an implied term in the contract upon which Amex relies for its business

model.[14]  However, contrary to well-settled law, Amex erroneously argues that it has the contractual

right to invest the proceeds, and apparently, for some defined period of time.

While there are no cases directly on point with respect to whether a seller of travelers checks

has a contractual right to invest the proceeds, the Court finds that cases that have dealt with bank

deposits are applicable in this discussion, particularly since Amex analogized the sale of travelers

checks to a bank deposit.  The Supreme Court long ago stated that

> the contract of deposit does not give the banks a tontine right to retain the
> money in the event that it is not called for by the depositor. It gives the bank
> merely the right to use the depositor's money until called for by him or some
> other person duly authorized. If the deposit is turned over to the state in
> obedience to a valid law, the obligation of the bank to the depositor is
> discharged.

Security Sav. Bank v. California, 263 U.S. 282, 286 (1923).  Accordingly, "[a] state law requiring

a bank, through appropriate procedure, to pay over such deposits, when long unclaimed, to the State

as depositary or by way of escheat, violates no right of the bank under the contract clause of the

Constitution or the due process clause of the Fourteenth Amendment, since the bank's contracts with

the depositors merely give it the use of the money until called for by proper authority, and payment

to the State in obedience to a valid law discharges its obligation to them." Id. at 282.  Indeed, the

Supreme Court reaffirmed this principle in Anderson Nat'l Bank v. Luckett, 321 U.S. 233, 242-43

(1944).  The Court stated that "since the bank is a debtor to its depositors, it can interpose no due

process or contract clause objection to payment of the claimed deposits to the state, if the state is

lawfully entitled to demand payment" because, once transferred to the state, the bank is no longer

liable as a debtor.  Id.   In other words, a state's ability to escheat ordinarily does not violate the

---

[14]      The Court notes that Amex's TCs do not expressly set forth on the checks any
contractual term that reflects Amex will invest the proceeds of the TCs.

Contract Clause in this context.

Nevertheless, Amex argues that the 15-year abandonment period, which was in effect prior to the enactment of Chapter 25, is an implied term of the contractual relationship between Amex and its customers and cannot be impaired retroactively.   The Court rejects Amex position at this stage for several reasons.   First, while in a Contract Clause analysis, the expectations of the parties to the contract and reliance upon state law at the time of the contract play a role in determining the substantiality of the contractual impairment, an important factor in determining the parties' expectations is whether the parties were operating in a regulated industry.   Mercado-Boneta v. Administracion del Fondo de Compensacion al Paciente, 125 F.3d 9, 13 (1st Cir. 1997)(citing Energy Reserves, 459 U.S. at 416).   Here, New Jersey has been  consistently regulating the sale of travelers checks, e.g., New Jersey's Money Transmitter Law and Uniform Commercial Code, and unclaimed property.   Therefore, because Amex was operating in a regulated industry, it could have readily foreseen future changes in regulation involving the subject matter of its contract. See, e.g., United States Trust, 431 U.S. at 19 n.17 ("[t]he parties may rely on the continued existence of adequate statutory remedies for enforcing their agreement, but they are unlikely to expect that state law will remain entirely static. Thus, a reasonable modification of statutes governing contract remedies is much less likely to upset expectations than a law adjusting the express terms of an agreement").   As such, Amex's expectations under the contract may not have been significantly affected.   See Energy Reserves, 459 U.S. at 411.

Second, Amex is correct in contending that the obligations of a contract have been regarded as including not only the express terms but also the contemporaneous state law relating to the contract.   However, not all "state regulations are implied terms of every contract entered into while

40

they are effective, especially when the regulations themselves cannot be fairly interpreted to require

such incorporation." General Motors, 503 U.S. at 189. For the most part, "state laws are implied

into private contracts regardless of the assent of the parties only when those laws affect the validity,

construction, and enforcement of contracts." Id. (citing United States Trust Co. 431 U.S. at 19, n.

17). The Supreme Court in General Motors elaborated on this principle:

> While it is somewhat misleading to characterize laws affecting the
> enforceability of contracts as "incorporated terms" of a contract, see 3 A.
> Corbin, Contracts § 551, pp. 199-200 (1960), these laws are subject to Contract
> Clause analysis because without them, contracts are reduced to simple,
> unenforceable promises. "The obligation of a contract consists in its binding
> force on the party who makes it. This depends on the laws in existence when
> it is made; these are necessarily referred to in all contracts, and forming a part
> of them as the measure of the obligation to perform them by the one party, and
> the right acquired by the other . . . . If any subsequent law affect to diminish the
> duty, or to impair the right, it necessarily bears on the obligation of the
> contract." McCracken v. Hayward, 43 U.S. 608, 2 How. 608, 612, 11 L. Ed.
> 397 (1844). See also [Von Hoffman v. City of Quincy, 71 U.S. 535, 4 Wall.
> 535, 550, 18 L. Ed. 403 (1867)]. A change in the remedies available under a
> contract, for example, may convert an agreement enforceable at law into a mere
> promise, thereby impairing the contract's obligatory force. See Sturges v.
> Crowninshield, 17 U.S. 122, 4 Wheat. 122, 197-198, 4 L. Ed. 529 (1819);
> Edwards v. Kearzey, 96 U.S. 595, 601, 24 L. Ed. 793 (1878). For this reason,
> changes in the laws that make a contract legally enforceable may trigger
> Contract Clause scrutiny if they impair the obligation of pre-existing contracts,
> even if they do not alter any of the contracts' bargained-for terms. See, e. g.,
> Von Hoffman v. City of Quincy, supra (repeal of tax designed to repay bond
> issue); Bronson v. Kinzie, 42 U.S. 311, 1 How. 311, 316, 11 L. Ed. 143 (1843)
> (law limiting foreclosure rights); McCracken, supra, at 611-614 (same).

General Motors, 503 U.S. at 189-190. Contrary to Amex's suggestion, it is clear from the forgoing

Supreme Court discussion that the State's escheat laws do not relate to the "validity, construction,

and enforcement" of the sales contract of travelers checks, nor do they impair the obligations of pre-

existing contracts. Amex's reliance on Nieves is misplaced because Nieves predates General

Motors, which then calls into question Nieves' analysis on implied contract under the Contract

Clause.  Moreover, the retroactive amendment to Virgin Island's Worker Compensation Act at issue in Nieves exposed employers to significant tort liability.  At the time the employer entered into employment contracts, the employer relied on state law which did not impose such a liability.  Consequently, the subsequent amendment altered the obligations of the employer under its existing contracts.  Nieves, 819 F.2d at 1248 ("Hess' expectation that its contracts of employment with its borrowed employees, albeit implied, were covered under the Workmen's Compensation Act was not unreasonable. The retroactive application provision, by completely destroying this expectation, represents a substantial impairment of Hess' contractual expectations.").  Contrary to the amendment in Nieves, while Amex might realize less profits than it had expected at the time it issued travelers checks, the State's escheat laws only seek to claim travelers checks that have been presumed abandoned; this type of regulation does not alter the parties' contractual obligations, implicitly or explicitly, nor does it subject Amex to any liability.

Third, and finally, while it is true that the terms to which the contracting parties give assent may be express or implied in their dealings, see Nieves, 819 F.2d at 1243, the contracting parties have to manifest assent to the implied terms of the contract.  General Motors, 503 U.S. at 188.  On this motion, Amex has not shown that the previous purchasers of travelers checks have assented to, or were even aware of, the fact that Amex had an investment period of at most 15 years for the proceeds of travelers checks.  Without such a showing, Amex's reliance on the Uniform Property Act and its expectation thereof is merely unilateral.  Accordingly, Amex has not shown that it will likely succeed on its Contract Clause claim.  Because the Court finds that there is no substantial impairment, the Court need not engage in an analysis of the remaining factors.

3.       **Takings Clause**

The first inquiry this Court must make in a takings analysis is to determine whether Amex has a property right in the opportunity to invest proceeds from the sale of travelers checks.  As a preliminary matter, the Court stresses that there is no dispute that New Jersey has the power to escheat.  See Delaware v. New York, 507 U.S. 490, 497 (1993) ("[s]tates as sovereigns may  take custody of or assume title to abandoned personal property as bona vacantia.").  Indeed, Plaintiffs concede that the State has the right to escheat and that power does not run afoul of the Constitution. Rather, Amex maintains that it has a constitutional right in the opportunity to invest the proceeds from the sale of its travelers checks.  Relying on Hollenbach, Amex reasons that it should enjoy a property interest in the funds generated when a customer purchases a traveler's check because, like a bank deposit that becomes the property of the bank, the purchase money passes to Amex until the check is cashed.  Having reviewed the relevant state law and authority on this issue, the Court finds that Amex has failed to satisfy its burden of showing that it will succeed on the merits with regard to its assertion that it has a constitutional right to invest in the proceeds from the sale of travelers' checks.

The Court's inquiry begins with state law.  Pursuant to N.J.S.A. 12A:3-104(i), "'Traveler's check' means an instrument that is payable on demand, is drawn on or payable at or through a bank, is designated by the term 'traveler's check' or by a substantially similar term, and requires, as a condition to payment, a countersignature by a person whose specimen signature appears on the instrument." N.J.S.A. 12A:2-104(i).  In that regard, a travelers check is essentially an unconditional promise to pay by the issuer when presented with the check document.  See N.J.S.A. 12A:3-106(c). Chapter 25 does not change the legal relationship between the purchaser, as the "owner" of "any sum

payable on a travelers check," and Amex, the "issuer" of the instrument.  N.J.S.A. 46:30B-11.  An "owner," in turn, is defined as a "creditor, a claimant, or payee in the case of other tangible property."  N.J.S.A. 46:30B-6(k).  Importantly, there are no New Jersey statutory provisions that expressly provide whether Amex retains a property interest in the proceeds until an owner, the purchaser of the travelers' check, redeems the check.  Additionally, the Court's research did not reveal any statute or case law, in New Jersey or otherwise, that expressly provides that Amex retains a property interest in the proceeds from the sale of travelers checks until they are either cashed or presumed abandoned; neither did Amex provide the Court with any conclusive authority on this issue, except for the Hollenbach decision.

In Hollenbach, the court in a cursory analysis found that "a purchase of a traveler's check is, in effect, a deposit with the financial institution issuing the check."  Id. at 761.  "The relationship between a bank and depositor is that of a debtor and creditor.  The bank then retains an interest in those funds until the money is claimed by the creditor."  Id.  For such a proposition, the Hollenbach court relied on Kentucky state and Supreme Court cases, which this Court finds do not support the Hollenbach court's decision in this respect.

Rather, I find guidance in the Supreme Court's decision in Delaware.  The Court begins with Delaware's proposition that

> [f]unds held by a debtor become subject to escheat because the debtor has no interest in the funds -- precisely the opposite of having "a claim to the funds as an asset." We have recognized as much in cases upholding a State's power to escheat neglected bank deposits. Charters, bylaws, and contracts of deposit do not give a bank the right to retain abandoned deposits, and a law requiring the delivery of such deposits to the State affects no property interest belonging to the bank. Security Savings Bank v. California, 263 U.S. 282, 285-286 (1923); Provident Institution for Savings v. Malone, 221 U.S. 660, 665-666 (1911). Thus, "deposits are debtor obligations of the bank," and a State may "protect the interests of depositors" as creditors by assuming custody over accounts

44

"inactive so long as to be presumptively abandoned." [Anderson Nat. Bank, 321 U.S. at 241 (emphasis added). Such "disposition of abandoned property is a function of the state," a sovereign "exercise of a regulatory power" over property and the private legal obligations inherent in property. [Standard Oil Co., 341 U.S. at 436].

Delaware, 507 U.S. at 502.  Here, because the "owner" of the travelers checks, or the purchaser, retains the property interest in the travelers checks, it would appear that Amex cannot assert any constitutional right to funds generated by the sale of travelers checks; Amex has not shown that any profits made by investing the funds for any given period of time would rise to a property interest under the Constitution. Hence, the Court finds that Amex has not shown that there is a likelihood that it can establish it enjoys a property interest in investing the proceeds of travelers checks – for any specified period of time – and therefore, it would not likely succeed on its takings claim.

### B.  Stored Value Cards

#### 1.  Preemption under Federal CARD Act

The Electronic Fund Transfers Act, 15 U.S.C. § 1693 et seq. ("EFTA") is a law establishing "the basic rights, liabilities, and responsibilities of consumers who use electronic fund transfer services and of financial institutions that offer these services."  12 C.F.R. § 205.1(b).  "The primary objective of the [EFTA] . . . is the protection of individual consumers engaging in electronic fund transfers."  Id.

Preceding the enactment of the Credit Card Accountability, Responsibility and Disclosure Act of 2009 ("CARD Act"), SVCs were not covered by the EFTA.  See 15 U.S.C. § 1693, et seq. (2006); 10A Hawkland U.C.C. Series § 2:20.  The Federal Reserve initially reasoned that SVCs need not be regulated by federal law because such cards "may only be used for limited purposes or on a short-term basis, and . . . may hold minimal funds."  Electronic Fund Transfers, 71 Fed. Reg.

51437-01, 2006 WL 2480319 (F.R.) (August 30, 2006).  Nonetheless, Congress passed the CARD

Act in 2009 in response to concerns that consumers were being taken advantage of by credit and gift

card issuers.  See H.R. 627, Credit Cardholders' Bill of Rights Act of 2009 , H.Rep. 111-88 at 9-10

(Apr. 27, 2009) (detailing credit card issuer abuses); S.414, Credit Card Accountability

Responsibility and Disclosure Act of 2009,  S.Rep. 111-16 (May 4, 2009) (describing dormancy,

inactivity, and other fees as well as expiration dates of less than five years as "unfair or deceptive

acts").[15]   Congress, further, directed that Federal Reserve regulations " take into consideration

current and future needs and methodologies for transmitting and storing value in electronic form."

31 U.S.C. § 5311 (Note).

The CARD Act explicitly precludes SVC issuers from issuing SVCs with an expiration date

of less than five years unless certain conditions are met:

> it shall be unlawful for any person to sell or issue a gift certificate,
> store gift card, or general-use prepaid card that is subject to an
> expiration date . . . [unless]  the expiration date is not earlier than 5
> years after the date on which the gift certificate was issued, or the date
> on which card funds were last loaded to a store gift card or
> general-use prepaid card; and . . . the terms of expiration are clearly
> and conspicuously stated.

15 U.S.C. § 1693l-1(c); see 12 C.F.R. 205.20(e).[16]

---

[15]      H.R. 627 ultimately became the Credit Card Accountability Responsibility and
Disclosure Act of 2009, but contained no gift card provisions.  S. 414 is not designated as formally
having become part of the CARD Act; however, it is designated as a bill related to H.R. 627 and
otherwise appears to be the basis for the CARD Act's gift card provisions.  See  Duncan B.
Douglass,  Credit Card Accountability, Responsibility and Disclosure Act of 2009 Becomes Law,
126 Banking L.J. 691 n.2 (2009).

[16]      The parties agree that the CARD Act covers the SVCs issued by the SVC Plaintiffs
in this case.  Indeed, the definitions of the Act specify that "general-use prepaid card[s]," redeemable
at multiple locations, and "store gift card[s]" are covered by the Act.  15 U.S.C. § 1693l-1(a)(2).

46

Importantly, the EFTA explicitly bars any state laws "relating to electronic fund transfers, except to the extent that those laws are inconsistent with the provisions of this subchapter, and then only to the extent of the inconsistency." 15 U.S.C. § 1693q. However, the FCRA clarifies, "[a] State law is not inconsistent with this subchapter if the protection such law affords any consumer is greater than the protection afforded by this subchapter." Id. Hence courts that have analyzed whether section 1693q preempts a state law have queried whether the state law affords greater protection to the consumer. See e.g., Stegall v. Peoples Bank of Cuba, 270 S.W.3d 500, 505 (Mo. App. S.D. 2008); Grillasca v. Amerada Hess Corp., No. 8:05-cv-1736-T-17TGW, 2006 WL 3313719, *3 (M.D. Fla. Nov. 14, 2006).

Federal Reserve Board ("FRB") regulations, authorized by the CARD Act, suggest circumstances in which the Board would consider a state law inconsistent with the CARD Act. See 15 U.S.C. § 1602 (granting Federal Reserve authority to issue rules to carry out the CARD Act). Relevant here is FRB's statement that a state law will be deemed inconsistent with the requirements of the CARD Act if it "[r]equires or permits a practice or act prohibited by the federal law ...." 12 C.F.R. § 205.12(b)(1) (emphasis added). The FRB regulations, further, permit states to apply for an exemption of "any class of electronic fund transfers within the state" from the EFTA. 12 C.F.R. § 205.12(c)(1). Such an exemption may be granted where "[u]nder state law the class of electronic fund transfers is subject to requirements substantially similar to those imposed by the federal law; and [t]here is adequate provision for state enforcement." Id.

Finally, for those card issuers that choose to issue cards with an expiration date, they must also comply with regulations requiring that specific disclosures be made on the card. Of import here are the disclosures relating to what occurs when a gift card (i.e., the tangible item) expires, but the

47

underlying funds are still available.  The disclosure must specify that:

> [t]he certificate or card expires, but the underlying funds either do not expire or expire later than the certificate or card, and; [t]he consumer may contact the issuer for a replacement card; and [n]o fee or charge is imposed on the cardholder for replacing the gift certificate, store gift card, or general-use prepaid card or for providing the certificate or card holder with the remaining balance in some other manner prior to the funds expiration date, unless such certificate or card has been lost or stolen.

12 C.F.R. 205.20(e)(3)-(4).  In other words,

> [w]hen it comes to expiration dates, a consumer has to contend with two different issues. First, the card or certificate itself can expire. Second, the consumer must often spend the funds represented by the card or certificate by a certain date. Complicating matters, the two dates do not have to coincide.

Stephen Veltri, et al., Payments, 65 Bus. Law. 1241 (Aug. 2010).

Despite this apparent incongruency between the expiration date for the card itself and the underlying funds, the regulations adopt a rather simple scheme to handle the differing expiration dates.  Under 12 C.F.R. 205.20(e), the consumer has five years to spend the funds on the card even if the card itself expires and needs to be replaced.  Id.  And, the issuer may not charge the consumer to replace the card itself.  This regulation does not apply, however, if the card has been lost or stolen. Noticeably, the regulation makes no mention of what occurs if the card has been presumptively abandoned under an escheat statute.

Plaintiffs argue that Chapter 25 is preempted under the doctrine of implied conflict preemption.  "Implied conflict preemption occurs when it is either impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  Kurns v. A.W. Chesterton Inc., --- F.3d ----, 2010 WL 3504312, *3 (3d Cir. Sept. 9, 2010) (internal quotations and

48

citation omitted); <u>accord</u> <u>Farina v. Nokia Inc.</u>, --- F.3d ----, 2010 WL 4138502, *10 (3d Cir. Oct. 22,

2010).  Courts must "consider 'the entire scheme of the . . . statute' and identify 'its purpose and

intended effect.' Only then can [courts] determine whether the opposing state law presents a

'sufficient obstacle' such that it requires preemption."  <u>Deweese v. National R.R. Passenger Corp.</u>,

590 F.3d 239, 246 (3d Cir. 2009) (internal citation omitted).

As recently reiterated by Third Circuit in <u>Farina</u>, a court must focus its preemption inquiry

on both congressional intent, and the structure and purpose of the federal statute:

> In every preemption case, our inquiry is guided by two principles.
> First, the intent of Congress is the "ultimate touchstone" of
> preemption analysis.  In discerning this intent, we look not only to
> Congress's express statements, but also to the "structure and purpose
> of the statute as a whole .... "

2010 WL 4138502 at *10 (internal citations omitted).  Importantly, a court must consider not only

the structure and purpose "as revealed . . . in the [statutory] text, but [also] through the reviewing

court's reasoned understanding of the way in which Congress intended the statute and its

surrounding regulatory scheme to affect business, consumers, and the law."  <u>Id.</u>

In connection with its issuance of the final CARD Act regulations, the Federal Reserve Board

responded to concerns that state escheat laws may conflict with the CARD Act:

> State escheat laws vary significantly. For example, the number of
> years that may elapse before an issuer must remit funds to the state
> differs among the states. Moreover, some state laws do not require an
> issuer of gift certificates or gift cards to remit remaining funds to the
> state in certain circumstances. *Some states may also provide a*
> *process through which an issuer may recover funds previously*
> *escheated to the state in the event the issuer subsequently honors a*
> *consumer's claim to funds.* As such, the Board believes it is not
> feasible or prudent to make a preemption determination that applies
> generally to all states.

75 FR 16580-01 (emphasis added).  The Federal Reserve further noted that, per its regulations, it will

issue its own determination as to preemption upon request.[17]   See id.

The SVC Plaintiffs place great weight on the Federal Reserve comment, suggesting that the comment supports their position that state escheat laws may be preempted by the CARD Act.  To the extent the SVC Plaintiffs suggest that this Court should defer to the Federal Reserve's comment as an agency interpretation of the CARD Act, the Court agrees that such agency deference is appropriate.  See Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 565 (1980) (applying Chevron deference to FRB interpretation of a statute); Clemmer v. Key Bank Nat. Ass'n, 539 F.3d 349, 351 (6th Cir. 2008) ("The EFTA grants to the Board of Governors of the Federal Reserve System . . .the authority and responsibility to 'prescribe regulations to carry out the purposes' of the act.) (quoting 15 U.S.C. § 1693b(a)).[18]  "[C]onsiderable respect is due the interpretation given a statute by the

---

[17]      In this connection, the State suggests that any preemption determination must be made by the FRB in the first instance.  I disagree. While 12 C.F.R. § 205.12(b) provides that "[t]he Board shall determine, upon its own motion or upon the request of a state . . . whether the act and this [regulation] preempt state law ....," the FRB's Official Staff Interpretation notes "[a] state law that is inconsistent may be preempted *even if the Board has not issued a determination*."  12 CFR Pt. 205, Supp. I (Aug. 22, 2010) (emphasis added).  And, "[u]nless demonstrably irrational, Federal Reserve Board staff opinions construing the Act or Regulation should be dispositive ...."  Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 565 (1980).  More to the point, the State has not pointed to any provision in the EFTA that divests federal courts of jurisdiction to hear preemption challenges.

[18]      The Supreme Court, in Household Credit Services, Inc. v. Pfennig, 541 U.S. 232 (2004), reiterates the Chevron deference applicable to the Federal Reserve Board:

> [I]n determining whether [the FRB's] interpretation of [statutory] text is binding on the courts, we are faced with only two questions. We first ask whether 'Congress has directly spoken to the precise question at issue.' Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If so, courts, as well as the agency, 'must give effect to the unambiguously expressed intent of Congress.' Id., at 842-843, 104 S.Ct. 2778. However, whenever Congress has 'explicitly left a gap for the agency to fill,' the agency's regulation is 'given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the

officers or agency charged with its administration ...."  <u>Ford Motor Credit</u>, 444 U.S. at 565 (internal

quotation marks and alterations omitted).  Moreover, the SVC Plaintiffs are correct in deducing from

the Federal Reserve's comment that state escheat laws *may* be preempted.  However, the mere

possibility of preemption does not end the inquiry.  By stating that "it is not feasible or prudent to

make a preemption determination that applies generally to all states," the Federal Reserve made clear

its view that state escheat laws must be analyzed on a statute-by-statute basis.

Turning to the New Jersey statute at bar, it is theoretically possible for an issuer subject to

New Jersey's escheat law to comply with both the escheat law and the CARD Act by honoring the

gift card and then seeking reimbursement from the State.  <u>See</u> N.J.S.A. 46:30B-42.1d ("Nothing in

this section shall be construed to prevent an issuer from honoring a stored value card, the

unredeemed value of which has been reported to the State Treasurer pursuant to R.S.46:30B-1 et

seq., and thereafter seeking reimbursement from the State Treasurer pursuant to R.S.46:30B-62.")

Indeed, this is what the Federal Reserve intimates when it noted "[s]ome states may also provide a

process through which an issuer may recover funds previously escheated to the state in the event the

issuer subsequently honors a consumer's claim to funds."  75 FR 16580-01.

Conceivably, there is a preemption problem in that Chapter 25 permits issuers to decline to

honor escheated gift cards after the two-year abandonment period but before the CARD Act's five-

year expiration-date limit.[19]  Although the statute does not "prevent an issuer from honoring a stored

statute.'  <u>Id.</u>, at 843-844, 104 S.Ct. 2778.

<u>Id.</u> at 239.

[19]    The Court clarifies here that there is a New Jersey statute that specifically addresses
expiration dates for gift cards.  "New Jersey's Gift Certificate Act ("GCA") supplements the CFA

value card," it also does not *require* an issuer to honor the card.   Clymer, 171 N.J. at 63 ("[U]pon delivery of the unclaimed property to the Treasurer, a holder is fully and unconditionally relieved of all liability concerning the property.") (citing N.J.S.A. 46:30B-61).  Were an issuer to refuse to honor the gift card, that could frustrate the purposes of the CARD Act by making it more difficult for a purchaser to redeem his or her card in the two-to-five-year time frame.  The purchaser would be required to somehow seek reactivation of the gift card through the unclaimed property division of the State, and it is unclear from the record how that would take place.  Moreover, purchasers with small balances, such as $25 or less, would not likely bother to seek reactivation of the escheated card.  On the other hand, the State argues, Chapter 25 affords consumers greater protection because, once the funds are taken into custody by the State, a consumer may recover his or her funds in perpetuity.  Furthermore, the Act does not prevent an issuer from honoring the gift card after escheatment to the State.

In my view, Chapter 25 affords consumers greater protection than that provided by the CARD Act's expiration provision.  While the CARD Act prevents issuers from expiring a card prior to the five-year limitation date, Chapter 25 imposes no time restriction on the consumer's right to recover his or her funds.  Moreover, for those SVCs that are redeemable only for goods or services, the effect of Chapter 25 is to convert the value of those cards into 100% cash value.  This means that the consumer holding a goods-or-services SVC may receive cash back after the abandonment period—a right the holder did not possess under his or her agreement with the SVC issuer.  The right

---

by establishing the standard for unlawful conduct in terms of gift certificates. N.J. Stat. Ann. § 56:8-110. The GCA provides that a gift certificate or gift card may not expire within 24 months immediately following the date of sale. Id. § 56:8-110(a)(1)."  Shelton v. Restaurant.com Inc., Civil Action No. 10-0824, 2010 WL 2384923, *2 (D.N.J. Jun. 15, 2010).

to receive cash back is a form of protection afforded by Chapter 25 that is not afforded, or even addressed, by the CARD Act.

I find this result consistent with the purposes and structure of the CARD Act. The CARD Act was enacted in order protect the interests of the consumer who purchases and uses SVCs. While the CARD Act, and the EFTA generally, set forth the rights and obligations attendant to card issuers, it is, at its core, a consumer protection statute and must be construed with that overarching purpose in mind. See 15 U.S.C. § 1693(b) ("The primary objective of [the EFTA] is the provision of individual consumer rights."); 12 C.F.R. § 205.1(b) ("The primary objective of the [EFTA] . . . is the protection of individual consumers engaging in electronic fund transfers."); Bank One, Utah v. Guttau, 190 F.3d 844, 850 (8th Cir. 1999). In addition, the Federal Reserve regulations that direct issuers to honor the underlying funds on a SVC even if the card itself has expired, 12 C.F.R. 205.20(e), buttresses my conclusion that the specific purpose of the CARD Act's five-year expiration date limitation is to ensure that consumers have access to their funds. While Chapter 25 may make it a more cumbersome process for a consumer to access his/her funds once the funds are presumed abandoned, it ultimately provides greater protection to the consumer by ensuring that the funds are available during the five-year time period and beyond. For these reasons, I conclude that the SVC Plaintiffs have not demonstrated a likelihood of success on the merits of their CARD Act preemption claim.[20]

---

[20]   Indeed, this Court's research has revealed only one instance in which the FRB concluded that a state law was preempted. In 1981, the FRB determined that a Michigan state law was inconsistent with and less protective of the consumer than the federal law because it "place[d] liability on the consumer for the unauthorized use of an account in cases involving the consumer's negligence" whereas "[u]nder the federal law, a consumer's liability for unauthorized use is not related to the consumer's negligence and depends instead on the consumer's promptness in reporting the loss or theft of the access device." 12 CFR Pt. 205, Supp. I (Aug. 22, 2010). Two other

2.      Texas Priority Rules

a.      Background of Escheat Laws

Many would agree that the new technologies of electronic gift certificates and stored value cards "do not necessarily fit neatly into the present framework for escheatment" enacted by the various states, and created by the Supreme Court in the Texas line of cases.  Anita Ramasastry, State Escheat Statutes and Possible Treatment of Stored Value, Electronic Currency, and Other New Payment Mechanisms, 57 Bus. Law. 475, 477 (2001).  For one, the issuers of gift cards and gift certificates have historically not retained the last known address of the purchaser, and have no means of tracking the whereabouts of the current recipient/owner of the certificate or card.  To be sure, travelers checks may suffer from the same historical infirmity, but with travelers checks there is a specific federal statute establishing a priority scheme.  12 U.S.C. § 2503.  No such provision has been enacted for SVCs.

The second complexity related to the escheatment of gift cards or certificates is how to define their value.  While some prepaid cards (i.e., open loop cards) can be used like cash at numerous locations, others may be redeemed only for goods or merchandise.  The escheatment framework must contend with how to value this latter group of cards, and whether to impose upon issuers the obligation to turn over to the state the full face value of the card with the prospect of losing the profits in the event the owner never attempts to redeem his gift card or reclaim his funds from the escheating state.  The UUPA provides for the escheat of gift certificates, "but if redeemable in

_____

provisions of the Michigan law were preempted because they were likewise inconsistent and less protective of the consumer's interests.  Id.

merchandise only, the amount abandoned is deemed to be [60] percent of the certificate's face value," UUPA § 2(6)(1995); however, states have taken various approaches to valuing merchandise-based SVCs for escheatment purposes.

Professor Anita Ramasastry aptly explains the conundrum posed by the escheatment of merchandise and service based SVCs:

> The question then arises as to whether there is property to escheat. If the originator of an electronic instrument or stored value card has an obligation to the owner to redeem unused value, the originator would be deemed a "holder" of unclaimed property and should fall under a state escheat statute's general provision. For example, if a stored value card represents cash that can be converted back into cash upon demand, the unused funds should be deemed reportable and subject to escheatment. A stored value card that does not require an obligation to redeem the unused value into cash, however, would not be abandoned property. Although there may be value on the card, there is no "property" to escheat.

Id. at 477.  Of course, as Texas directs, state law determines the contours and terms of the debtor-credit relationship in the SVC context.  So, the question posed by the author in this passage–whether there is any "property" to escheat—must be resolved in this case by turning to New Jersey state law.

As noted, New Jersey did not initially include gift certificates in its unclaimed property act, see In re November 8, 1996, 309 N.J.Super. at 277-79, even though the 1995 Uniform Unclaimed Property act includes gift certificates in its definition of intangible property.  The Appellate Division noted in In re November 8, that several states had specifically excluded gift certificates from their unclaimed property statutes, or chose to value them at less than face value in order to compensate for the issuer's profit.  For example, and as noted infra, Arizona's unclaimed property act provides that "Property does not include ... property that is referred to or evidenced by gift certificates, electronic gift cards, nonrefundable tickets, certificates evidencing property denominated in value

55

other than a currency, including prepaid phone cards, frequent flyer miles, stored value cards, and merchandise points." A.R.S. § 44-301(15).  Other states likewise exempt gift cards or gift certificates redeemable for only goods or services from escheat.  See e.g.,Ark. Stat. Ann. § 18-28-201(13)(B) (Arkansas); Colo. Rev. Stat. §38-13-108.4 (Colorado); Conn. Gen. Stat. §3-73a (Connecticut); Fla. Stat. §717.1045 (Florida).

More recent compilations of state laws reveal that the lack of uniformity among the states as to how to value gift certificates and gift cards persists.  See generally National Conference of State Legislatures, Gift Cards and Gift Certificates Statutes and Recent Legislation, http://www.ncsl.org/default.aspx?tabid=12474 (visited Nov. 11, 2010) (last updated September 3, 2010).  Several states escheat gift cards, including Delaware, Del. Code Ann. tit. 12, §1197, et seq., and Georgia,  Ga. Code §44-12-205, inter alia.  Of those states, several escheat at full face value. See e.g., Alaska Stat. §34.45.240 (Alaska); D.C. Code Ann. §41-101, et seq. (District of Columbia); Hawaii Rev. Stat. §523A-14 (Hawaii).  Others escheat at less than full face value, or only those gift cards exceeding a set dollar amount.  Alabama, for example, escheats at 60% value those cards redeemable only for merchandise.  Ala. Code § 35-12-72(a)(17).  Wyoming escheats only those cards exceeding $100 in value.  Wyo. Stat. § 34-24-114 (1993).  Recently, one state passed legislation escheating gift cards retroactively.  See Mich. Comp. Law Ann. § 567.235 (Oct. 5, 2010).  And, the gift card escheat laws of some states do not fit neatly into any of the aforementioned categories.  See e.g., Cal. Civ. Proc. Code §1520.5 (exempting gift cards usable with multiple sellers of goods or services); Idaho Code §14-501(10)(b) (escheating only those gift cards without an expiration date printed on the card).

**b.      Pullman Abstention and the Treasury Guidances**

As an initial matter, the Court must address the legal effect of the Treasury Guidances issued after Chapter 25's enactment.  If the Guidances represent a permissible exercise of the Treasury's authority, they will serve to limit the Court's supremacy clause inquiry under the Texas line of cases.

The State urges this Court to abstain, under Railroad Comm'n v. Pullman Co., 312 U.S. 496 (1941),  from deciding the legal effect of the Guidances that redefine the scope of Chapter 25's escheat rules for SVCs.  The Court notes, at the outset, that "[a]bstention from the exercise of federal jurisdiction is, in all its forms, the exception, not the rule." Muir, 792 F.2d at 360 (quoting Colorado River Water Conservation District v. United States, 424 U.S. 800, 813 (1976)) (internal citations omitted).  And, "[a] district court has little or no discretion to abstain in a case that does not meet traditional abstention requirements." Id. at 361 (citation omitted).

"Pullman abstention . . . instructs that federal courts should abstain from decision when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." Id. (quoting Hawaii Housing Authority v. Midkiff, 467 U.S. 229, 236 (1984)) (internal quotation marks omitted).  Whether a question of state law is unsettled is a legal determination. Id.  By way of example, "[a] statute is unsettled for Pullman purposes when two of its provisions are contradictory" or it is otherwise ambiguous. Id. (quoting  Georgevich v. Strauss, 772 F.2d 1078, 1090-91 (3d Cir. 1985) (en banc), cert. denied, --- U.S. ----, 106 S.Ct. 1229, 89 L.Ed.2d 339 (1986).  Furthermore, "an administrative interpretation of a facially ambiguous state statute will not remove the ambiguity, for Pullman purposes." Id.  at 362 (citing Anderson v. Babb, 632 F.2d 300, 306 (4th Cir. 1980)).

Suggesting that the legal effect of the Treasury Guidances is a difficult or unsettled question

of state law, the State argues here that the interplay of the Guidances and Chapter 25 should be determined by the New Jersey courts in the first instance under the Pullman abstention doctrine. However, the Third Circuit has held Pullman abstention inappropriate in preemption cases:  "[A] federal court should not abstain under Pullman from interpreting a state law that might be preempted by a federal law, because preemption problems are resolved through a non-constitutional process of statutory construction." Id. at 363.  See also New Jersey Payphone Ass'n, Inc. v. Town of West New, 130 F.Supp.2d 631, 634 (D.N.J. 2001) (citing Muir, 792 F.2d at 361).[21]  Because, as explained infra, Chapter 25, without the benefit of the Guidances, is facially inconsistent with the Texas priority scheme, this Court may not abstain from deciding the legal import of the Treasury Guidances under Pullman.  Accord Ayers v. Philadelphia Housing Authority, 908 F.2d 1184, 1194 n. 21 (3d. Cir. 1990) (vacating district court's Pullman abstention ruling in federal preemption case).

The State, further, argues that Pullman abstention is appropriate because the federal preemption question could be resolved by a New Jersey court decision holding that the Treasury Guidances were authorized by state law.  The Court disagree.  The State's argument presumes that the Treasury Guidances render Chapter 25 wholly consistent with the Texas  priority scheme.  But the Treasury Guidance language that implements the Texas priority scheme applies only retroactively to those "stored value cards issued prior to the date of [its] announcement"—September 23, 2010.

---

[21]	Several courts of appeals faced with the issue of whether Pullman preemption may apply to preemption claims have reached the same result.  See Fireman's Fund Ins. Co. v. City of Lodi, California, 302 F.3d 928, 940 (9th Cir. 2002) (holding that ; GTE North, Inc. v. Strand, 209 F.3d 909, 921 (6th Cir. 2000); Bath Memorial Hosp. v. Maine Health Care Finance Com'n, 853 F.2d 1007, 1013 (1st Cir. 1988); Federal Home Loan Bank Bd., Washington, D.C. v. Empie, 778 F.2d 1447, 1451 (10th Cir. 1985).  But see Fleet Bank, Nat. Ass'n v. Burke, 160 F.3d 883, 893, 893 n.8 (2d Cir. 1998) (suggesting that Pullman abstention is appropriate where the plaintiff's preemption claim does not challenge the meaning and application of state law).

Thus, even if the Treasury Guidance could render the retroactive application of Chapter 25 constitutional, this Court must separately consider the prospective application of the Act.  Hence, the Court will not abstain from deciding the validity of the Guidances under the <u>Pullman</u> preemption doctrine.

**c.     Standing**

One of Plaintiffs' constitutional challenges is that the Act violates the priority rules established by the Supreme Court in <u>Texas v. New Jersey</u>, 379 U.S. 674 (1965), and its progeny, which rules dictate what state is entitled to escheat abandoned, intangible property in the case of a transaction involving more than one state.  As explained in <u>Delaware</u>,

> [n]o serious controversy can arise between States seeking to escheat tangible property, real or personal, for it has always been the unquestioned rule in all jurisdictions that only the State in which the property is located may escheat. On the other hand, intangible property is not physical matter which can be located on a map, and frequently no single State can claim an uncontested right to escheat such property.

507 U.S. at 497-98 (internal quotation marks and citations omitted).

In order to facilitate resolution of such disputes, the Supreme Court created two priority rules.  The first rule provides: "the right and power to escheat the debt should be accorded to the State of the <u>creditor's last known address</u> as shown by the debtor's books and records."[22]  <u>Texas</u>, 379 U.S. at 680-81.  This rule is referred to as the "primary rule."  Where the creditor's last known address

---

[22]     A creditor "might be either a payee or a sender: 'the payee of an unpaid draft, the sender of a money order entitled to a refund,' or a payee or sender 'whose claim has been underpaid through error.'"  <u>Delaware</u>, 507 U.S. at 503 (quoting <u>Pennsylvania v. New York</u>, 407 U.S. 206, 213 (1972)).  A debtor, in the escheat context, is typically the issuer of a money order, stored value card, or other obligation.  <u>See</u> <u>Id.</u> at 504.  The precise determination of the debtor-creditor relationship depends upon state law.  <u>Id.</u> at 503-04.

59

is unknown, or where the last known address is in a state that does not provide for the escheat of the abandoned property, the second priority rule comes into play.  Id. at 682; Delaware, 507 U.S. at 498.  That rule, referred to as the "secondary rule," "award[s] the right to escheat to the debtor's State of corporate domicile ...."  Texas, 379 U.S. at 683; see also Delaware, 507 U.S. at 498.  According to the Supreme Court, these two rules are "the fairest, . . . easy to apply, and in the long run . . . the most generally acceptable to all the States."  Texas, 379 U.S. at 683.

The Supreme Court applied these rules in  Pennsylvania v. New York, 407 U.S. 206 (1972), a suit brought by the Western Union Company ("Western Union").  In that case, Western Union had not retained the last known address of purchasers of its money orders.  Several states "perceived injustice" because the primary rule would rarely apply in light of Western Union's failure to maintain last known addresses, and the secondary rule would often apply, resulting in the abandoned money orders most often escheating to the state of Western Union's domicile.  Id. at 214.  Rejecting the states' argument that an alternate rule should be established, the Supreme Court upheld the two-rule priority scheme, reasoning "the resulting likelihood of a windfall for the debtor's State of incorporation would [not] justify the carving out of an exception to the Texas rule[s]."  Id. at 214.

Relevant here, the plaintiff States in Pennsylvania urged the Supreme Court to  "define the creditor's residence according to a presumption based on the *place of purchase*,"  id. (emphasis added), because there were numerous money order transactions for which no last known address was kept.  The Supreme Court explicitly rejected this proposal, reasoning:

> Texas v. New Jersey was not grounded on the assumption that all creditors' addresses are known. Indeed, as to four of the eight classes of debt involved in that case, the Court expressly found that some of the creditors 'had no last address indicated.' Thus, the only arguable basis for distinguishing money orders is that they involve a higher percentage of unknown addresses. But . . . to vary the application of

the Texas rule according to the adequacy of the debtor's records
would require this Court to do precisely what we said should be
avoided-that is, 'to decide each escheat case on the basis of its
particular facts or to devise new rules of law to apply to
ever-developing new categories of facts.'

Id. at 214-15 (internal citations omitted); see also Delaware, 507 U.S. at 509.

The Supreme Court reaffirmed the immutability of the priority rules a second time in

Delaware.  In that case, abandoned securities distributions could not be traced to a last known

address.  507 U.S. at 500.  Hence, those distributions "f[e]ll out of the primary rule and into the

secondary rule.  Consequently, under Texas and Pennsylvania, the debtor's State of incorporation

should [have] be[en] entitled to escheat this unclaimed property."  Id.  In rejecting the State of New

York's arguments for variations of the priority rules, the Supreme Court reiterated that the place of

purchase may not be used to override the primary or secondary rule.  Id. at 509.

Defendants argue that Plaintiffs do not have standing to challenge the Act based on Supreme

Court priority precedents because Plaintiffs are not states.  This Court rejects the State of New

Jersey's standing argument.  AMEX Prepaid is incorporated in Arizona—a state that does not

escheat stored value cards.  Happ Decl. at ¶ 20.  Under the secondary rule, those corporations

incorporated in a state that does not escheat SVCs are entitled to retain the abandoned SVCs when

the address of the owner is unknown.  But under Chapter 25, those corporations would never be

entitled to retain such SVCs.[23]  By stating that the place of purchase may be substituted for the

owner's address when that address is unknown, the Act assures that the primary rule will always

operate.   In so doing, the Act deprives corporations of the benefit of the secondary rule.  Here,

---

[23]     This argument applies with equal force to those SVC issuers that utilize subsidiaries
or cooperatives to issue their gift cards because it is, ultimately, the issuer that would be permitted
to retain the unused value.

because AMEX Prepaid is incorporated in a state that does not escheat SVCs in situations where the owner's address is unknown, Amex has heretofore enjoyed the benefit of Arizona not escheating abandoned SVCs.[24]

The language of the Act, before consideration of the Guidances, makes clear how it arguably obviates the secondary rule. I raise these preemptive concerns only for the sake of illustrating that the SVC issuers stand to suffer injury-in-fact under Chapter 25. A more complete preemption analysis follows in my substantive analysis of the statute under the <u>Texas</u> line of cases.

Chapter 25 requires issuers to "obtain the name and address of the purchaser or owner . . . and shall, at a minimum, maintain a record of the *zip code* of the owner or purchaser." Chapter 25, ¶ 5c (emphasis added). The Act, further, provides

> [i]f the issuer of a stored value card does not have the *name and address* of the purchaser or owner of the stored value card, the address of the owner or purchaser of the stored value card *shall assume the address of the place where the stored value card was purchased or issued* and shall be reported to New Jersey if the place of business where the stored value card was sold or issued is located in New Jersey.

<u>Id.</u>, ¶ 5c (emphasis added); N.J.S.A. 46:30B-42.1c (emphasis added). Inexplicably, the Act does not provide that this place of purchase presumption applies when the *zip code* is unknown. In operation, the Act dictates that the presumption applies when the "name and address" of the purchaser/owner is unknown while, at the same time, neglecting to require the issuer to retain that information. And, even when the zip code is retained, the issuer is directed to presume that the place of purchase is the

---

[24]    AMEX Prepaid earns its profit from the sale of stored value cards by, *inter alia*, investing the card proceeds until the funds are redeemed and retaining those funds never redeemed by the owner. Happ Decl., ¶ 10. This latter category is referred to as "breakage." <u>Id.</u> It is the deprivation of these two forms of income that causes AMEX Prepaid harm.

owner's or purchaser's address.  Furthermore, the "place of purchase" rule applies only if the stored value card was sold in New Jersey—not other states.

Read as a whole, this language illustrates how the secondary rule will not apply to the sale of stored value cards in New Jersey based upon the plain language of the statute and before an analysis of the applicability of the Treasurer's Guidances, as explained in more detail <u>infra</u>.  For this reason, I conclude that AMEX Prepaid has demonstrated that it will suffer an injury-in-fact because it will be deprived of the benefits it obtains when the secondary priority rule is properly applied.

Plaintiffs Retail Merchants and Food Council likewise have standing to challenge Chapter 25 based upon the Supreme Court priority rules, to the extent that their members issue their own stored value cards and they are incorporated in states that do not escheat gift cards.[25]  This results in differing standing rulings for different members of the Food Council and Retail Merchants associations, depending upon their state of incorporation.  Furthermore, members of the Food Council and Retail Merchants associations do not have standing in connection with their sale of cards issued by third parties because only issuers of cards (*i.e.*, the merchant obligated to honor the stored value card) is obligated to escheat and entitled to the benefit of the secondary priority rule.[26]

For example, according to the Declaration of James F. Watson, the New Jersey cooperative,

---

[25]     These plaintiffs earn their profits by selling their cards at face value, and then redeeming for goods or services at a rate exceeding their costs.  They recognize their profit upon redemption of the card.  See generally Rowe Afft., ¶ 17.  In the event a gift card is not redeemed, the owner's last known address is unknown, and the issuer is incorporated in a state that does not escheat gift cards, the issuer-plaintiff may retain the gift card proceeds or breakage.  Chapter 25 deprives thse plaintiff of this income producing option.

[26]     By way of example, a convenience store that sells a card issued by a bookstore would not suffer harm because the secondary rule relates to the state of incorporation of the creditor.  As noted, the "creditor" in the escheat context is the party responsible for honoring the stored value card.

Wakefern Food Corp., is comprised of owners and operators of ShopRite supermarkets in New Jersey, Maryland, Delaware, Pennsylvania, New York, and Connecticut.  Watson Decl. at  ¶ 2. These entities, which are members of the Food Council, sell their own proprietary gift cards, see Id. at ¶ 4, prepaid credit and debit cards, see id. at ¶ 15, and third-party cards redeemable at national and local retailers.  See Id.  What is critical for the standing analysis is that the Wakefern Food Corp. members are all incorporated in New Jersey.  Hence those entities do not have standing because they are not incorporated in a different state, and the secondary priority rule would never come into play. The same is true for members of the Foodtown, Inc. cooperative, which is incorporated in New Jersey.  Durkin Decl. at ¶¶ 1-2.

The Court appreciates Food Council's argument that its members incorporated in New Jersey nonetheless have standing because Chapter 25 places them at a competitive disadvantage with their competitors incorporated in non-escheating states, see Id. at ¶ 30; however, Food Council has not cited to any case law indicating that such a purported competitive disadvantage constitutes injury for standing purposes.

Other members of the Food Council, however, are "incorporated throughout the United States, including Delaware, Maryland, New Jersey, and elsewhere." Doherty Decl., ¶ 3.  Maryland does not escheat gift cards.  Md. Commercial Code Ann. §17-101(m).  Thus, the Food Council has standing on behalf of its members incorporated in states that do not escheat stored value cards. Finally, the Court notes that some Food Council members issue gift cards through a separately incorporated entity.  See id. at ¶ 7.  This does not alter the Court's analysis because it is the issuer's state upon which application of the secondary priority rule turns and, where that issuer is a subsidiary, the harm sustained by the subsidiary would flow to the parent corporation.  In sum, the

Court concludes that Plaintiffs AMEX Prepaid, Food Council, and Retail Merchants have standing to challenge Chapter 25's failure to comply with the Supreme Court's priority rules, to the extent that Plaintiffs have demonstrated that they issue stored value cards and are incorporated in states that do not escheat gift cards.[27]

### d.    Application of <u>Texas</u> Priority Rules to Chapter 25 and Guidances

While the SVC Plaintiffs contend that both Chapter 25 and the Guidances are each preempted by the <u>Texas</u> line of cases, the State argues that the Guidances are a reasonable agency interpretation of Chapter 25 entitled to deference under State law.  The Court's preemption analysis, therefore, is three-fold.  First, the Court must address whether the statute, on its face, violates the Supreme Court's priority scheme.  For the reasons stated herein, the Court concludes that the statute's place-of-purchase presumption violates the priority rules.  Second, the Court must address whether, and to what extent, the Treasurer's Guidances embody a reasonable interpretation of the statute.  As to this issue, the Court concludes that the Guidances constitute such a reasonable interpretation.  Finally, the Court must address whether the Treasurer's Guidances eradicate Chapter 25's constitutional infirmities.  The Court finds that they do not.

### (i)    Chapter 25's Place of Purchase Presumption

As noted, the Supreme Court has created escheat priority rules, which "arise from [its] 'authority and duty to determine for [itself] all questions that pertain' to a controversy between States, . . . and *no State may supersede them by purporting to prescribe a different priority under state law*."  <u>Delaware</u>, 507 U.S. at 500 (internal citation omitted) (emphasis added).  These rules

---

[27]    For this same reason, and contrary to the State's assertion, Plaintiff Retail Merchants can demonstrate an injury-in-fact in connection with its Full Faith & Credit Clause claim.

constitute federal common law developed in response to the "overriding federal interest in the need for a uniform rule of decision ...." where more than one state could potentially escheat intangible personal property.  Illinois v. City of Milwaukee, 406 U.S. 91, 105 (1972); Id. at 106 (citing Texas, 306 U.S. at 405 as an example of federal common law).  Recognizing that federal common law has the same preemptive force as the Constitution or laws of Congress, the State concedes that the Texas priority rules may preempt inconsistent state law.

The State argues that its priority scheme is fully consistent with Texas and its progeny.  As summarized by the Supreme Court in Delaware, Texas created two priority rules:

> (1)　where the last known address of the creditor (*i.e.*, owner of the intangible personal property) is known, the State in which that address is located has the right to escheat ("primary rule"); and

> (2)　where the last known address of the owner is unknown, or in a state that "does not provide for escheat of the property owed," the State in which the debtor is incorporated is awarded the right to escheat subject to the "superior" right of the creditor's state should the creditor's state submit proof of the owner's address ("secondary rule").

See 507 U.S. at 499.  On its face, Chapter 25 provides that the place of purchase will be substituted for the last known address of *all* unknown addresses: "If the issuer of a stored value card does not have the name and address of the purchaser or owner . . ., the address of the owner or purchaser of the stored value card *shall assume the address of the place where the stored value card was purchased* ...."  Chapter 25, § 5c.  The statute makes no accommodation for the issuer's domicile or State of incorporation in connection with this place-of-purchase presumption.

This presumption, on its face, clearly violates the secondary priority rule by ignoring the right of the debtor's state of incorporation to escheat in the event that the owner's last known address was

not retained.  See Pennsylvania, 407 U.S. at 214-15 (rejecting a secondary rule based on place of purchase).  The State argues that the Treasury Guidances remedy this defect by incorporating the secondary rule into the escheat scheme applicable to SVCs, and by directing that all issuers must retain at least the purchaser's zip code.  Hence, I now consider the legal effect of the Guidances.

### (ii)    Guidances as Reasonable Interpretation

While Chapter 25, on its face, fails to incorporate the secondary priority rule, portions of Treasury Guidance dated September 23, 2010, acknowledge the right of the debtor's state of incorporation to escheat when the owner's last address is unknown:

> • *If the issuer is domiciled in New Jersey*, any unredeemed balances of stored value cards issued prior to the date of this announcement where the names and addresses or zip code of the purchasers or owners were not recorded *must be reported to New Jersey*.

> • *If the issuer is not domiciled in New Jersey*, any unredeemed balances of stored value cards issued prior to the date of this announcement where the names and addresses or zip code of the purchasers or owners were not recorded *should be reported to the state in which the issuer is domiciled* in accordance with that state's unclaimed property laws.

> • *If the issuer is not domiciled in New Jersey and the issuer's state of domicile exempts this type of property from its unclaimed property statute*, any unredeemed balances of stored value cards issued prior to the date of this announcement where the names and addresses or zip code of the purchasers or owners were not recorded *must be reported to New Jersey if the cards were issued or sold in New Jersey*.  In these instances, the issuer must maintain the address of the business where the stored value card was purchased or issued.

Treasury Guidance dated Sept. 23, 2010 at 3 (emphasis added).  Unlike the plain language of the statute, the Guidances provide that the place-of-purchase presumption applies only where the debtor's State of incorporation "exempts [SVCs] from its unclaimed property statute ...."  Id. Although this Guidance language applies only retroactively, if the Guidance language constitutes a

67

reasonable interpretation of the statute, and does not violate the <u>Texas</u> priority scheme, it could render the statute constitutional on a retroactive basis.

Under New Jersey law, the Treasury Department's interpretation of New Jersey's escheat statute is entitled to deference. <u>Clymer</u>, 171 N.J. at 67. Where, as here, there is an "absence of case law" interpreting a precise issue under a statute, "the Treasurer's construction of the statute takes on added significance." <u>Id.</u> Thus, in construing the escheat statute, New Jersey courts are directed to "give[ ] appropriate weight" to the Treasurer's interpretation. <u>Id.</u> This is not to say that any interpretation by the Treasurer will suffice; rather, the Treasurer's interpretation must be "consistent with the Legislature's intent in enacting the statute, consonant with the State's strong public policy favoring custodial escheat, and reflective of a sensible reading of the statute itself." <u>Id.</u>

Simply put, the Treasurer's interpretation of the statute must be reasonable. <u>See</u> <u>In re Suspension of Teaching Certificate of Van Pelt</u>, 414 N.J.Super. 440, 485 (App. Div. 2010) ("[B]eing a strictly legal issue, a . . . court is not bound by an agency's construction of a statute, and an agency's determination will be reversed where it is plainly unreasonable.")  (quoting <u>T.H. v. Div. of Developmental Disabilities</u>, 189 N.J. 478, 490 (2007)) (internal quotation marks omitted)). According to the New Jersey Supreme Court, there are several circumstances in which an administrative interpretation will be deemed unreasonable, where the interpretation: (a) gives a statute "greater effect than is permitted by the statutory language;" (b) is "plainly at odds with the statute,"; (c) "violates express and implied legislative intent." <u>T.H.</u>, 189 N.J. at 490-91. To ascertain whether an agency interpretation avoids these legislative landmines, then, a court must first determine the meaning of the enabling statute.

In determining legislative meaning, New Jersey courts first look to the plain language of the

statute, considering it along with the statute's structure, history, and underlying policies.  Id. at 491.

By way of example, in T.H., the New Jersey Supreme Court determined that administrative regulations imposing an age limit of "before age 22" upon applicants with developmental disabilities was inconsistent with the enabling statute which did not include an express age limitation.  Id. at 492.  That court reasoned:

> Although we recognize the deference that an administrative agency regulation is ordinarily accorded, we repeat here the well-established principle that that [sic] deference is not warranted where the agency alters the terms of a legislative enactment. *This is not a case in which an agency simply filled in the interstices of an act* or provided details specifically left to it by the Legislature. Rather, in adopting [its regulations, the agency] added an eligibility standard that does not exist in [the enabling statute]. That regulation, therefore, is not entitled to deference.

Id. at 494-95 (emphasis added).

Here, by contrast, the Treasury Regulations "fill[ ] in the interstices of [Chapter 25]."  Id.  Under New Jersey law, a state agency expressly authorized by statute to implement rules and regulations may flesh out statutory directives through subsequent rulemaking.  Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 336 (1984).  The rationale underlying such delegation is that "[p]ersons subject to regulation are entitled to something more than a general declaration of statutory purpose to guide their conduct before they are restricted or penalized by an agency for what it then decides was wrong from its hindsight conception of what the public interest requires in the particular situation."  Id. at 337 (quoting Boller Beverages, Inc. v. Davis, 38 N.J. 138, 151 (1962)).  This reasoning has been held equally applicable to other forms of agency action.  Id. (applying agency deference rationale to agency's decision to use a particular non-statutory factor in assessing a corporation for tax liability).

For example, in <u>Metromedia</u>, the New Jersey Supreme Court upheld a decision by the Director of the Division of Taxation to "modify the statutory formula for determining a multi-state taxpayer's New Jersey tax base by which the tax is measured." <u>Id.</u> at 337.  In that case, the court noted:

> In a case such as this, involving a multi-state radio and television enterprise reaching audiences in several states, the language of the statute supports the determination of a more realistic method than provided by the statutory three-ply formula to calculate the receipts of the taxpayer that can fairly and reasonably be attributable to its activities in New Jersey.

<u>Id.</u>

Here, the State appears to argue that Chapter 25 granted the Treasurer statutory authority to issue the portions of the Guidances related to the escheat priority scheme.  But the State has pointed to no express language in Chapter 25 to that effect.  While Chapter 25 authorizes the Treasurer to grant certain exemptions, the statutory language does not reach the precise issue presented here.  Rather, the language authorizes the Treasurer to grant exemptions "from [Chapter 25] . . . for a business or class of businesses that demonstrate good cause ...."  Thereafter, it describes the factors to be considered to include "the amount of stored value card transactions processed, the technology in place, whether or not stored value cards issued contain a microprocessor chip, magnetic strip, or other means designed to trace and capture information about place and date of purchase, and such other factors as the State Treasurer shall deem relevant."  N.J.S.A. 46:30B-42.1(f).  This list of factors makes no mention of the issuer's (or debtor's) state of incorporation, and its tenor does not suggest that it is directed at the priority scheme.

Even without an express statutory grant within Chapter 25, however, it is my view that the Legislature's general grant of authority to the Treasurer to "assist[ ] in the implementation of the

legislative design," sufficiently empowers the Treasure to issue the Guidances.   Clymer, supra at 67.  The Guidances further explicate how SVCs are to be escheated in a way that is consistent with the legislature's "strong public policy favoring custodial escheat ...."  Id. at 68.

Furthermore, I find the Guidances consistent with overall statutory scheme.  The general priority provisions of the Unclaimed Property Act permit New Jersey to hold intangible property where "[t]he transaction out of which the property arose occurred in this State, and . . . [t]he holder is a domiciliary of a state that does not provide by law for the escheat or custodial taking of the property or its escheat or unclaimed property law is not applicable to the property ...." N.J.S.A. 46:30B-10.  And, N.J.S.A. 46:30B-81.d, allows New Jersey to hold the property until a debtor State of incorporation "has escheated or [the property] become[s] subject to a claim of abandonment by that state ....".  Thus, the Treasurer's Guidances appropriately reconcile Chapter 25 with, and integrate Chapter 25 into, the Unclaimed Property's Act overall scheme, thereby effectuating the Act's purpose.[28]

Similarly, the Guidances render Chapter 25 consistent with the 1981 version of the UUPA, which served as the model for the New Jersey priority provisions.  Section 3 of the UPPA (1981) permits a state to custodially escheat property when

> the transactions out of which the property arose occurred in this State, and . . . the holder is a domiciliary of a state that does not provide by law for the escheat or custodial taking of the property or its escheat or unclaimed property law is not applicable to the property.

UPPA § 3(6)(ii) (1981).  Like N.J.S.A. 46:30B-81.d, section 25 of the UUPA (1981) provides that,

---

[28]     While "it is well settled that where the Legislature specifically includes a requirement in one subsection of a statute but not in another, the term should not be supplied where it has been omitted," T.H., 189 N.J. at 492, that rule of interpretation carries less force where the "sense of a statute" suggests otherwise.  See Id.

where funds have been delivered to New Jersey, a debtor State of incorporation may recover the funds by demonstrating that "the laws of the state of domicile of the holder the property has escheated to or become subject to a claim of abandonment by that state." In this way, the Guidances help ensure that the Act is "applied and construed as to effectuate its general purpose to make uniform the law with respect to the subject of this law among states enacting it," N.J.S.A. 46:30B-2 cited in Clymer, 171 N.J. at 400, thereby effectuating the purpose underlying the Unclaimed Property Act. See Haven Savings Bank v. Zanolini, 416 N.J.Super. 151, 166 (App. Div. 2010) ("[New Jersey's unclaimed property act] should be construed to achieve and maintain uniformity with the thirty-nine jurisdictions that have adopted either the 1981 or 1995 Uniform Act.").

Plaintiff Food Council argues that the Treasurer's Guidances are an impermissible revision of the Unclaimed Property Act, citing Galbraith v. Lenape Regional High School, 964 F.Supp. 889 (D.N.J. 1997). In Galbraith, a District of New Jersey district court noted: "Administrative agencies belong to a separate branch of government and are only empowered to 'exercise executive power in administering legislative authority selectively delegated to them by statute." Id. at 894. This statement in Galbraith is nothing more than a restatement of the New Jersey's agency deference law, and is unhelpful in elucidating any of the issues here. That Galbraith is inapposite is further illustrated by the source of its quote—City of Hackensack v. Winner, 82 N.J. 1, 28 (1980). Both Galbraith and Winner are entire controversy cases that have nothing to do with agency interpretation of an enabling statute.

Finally, Plaintiff Retail Merchants appears to argue that the New Jersey legislature violated a nondelegation doctrine by failing to provide adequate boundaries for the Treasurer's discretion. The New Jersey Supreme Court in Worthington v. Fauver, 8 N.J. 183 ( 1982) explains:

72

> whether [an act] itself represents an unconstitutional delegation of power by the Legislature to the executive branch . . . requires a determination of whether the delegation impairs the 'essential integrity' of the Legislature, and whether it provides sufficient standards to guide the exercise of delegated power.

Id. at 207-08 (internal citations omitted).  Other than its *ipse dixit* conclusion that the Guidances' priority language "clearly runs afoul" of this precept, Retail Merchants has not pointed to any specific language in Chapter 25 of the Unclaimed Property Act that it contends is insufficiently specific.  To the contrary, Chapter 25 specifically addresses the escheat priority scheme and the pertinent language in the Guidances explicate upon this one precise issue.  The tailored nature of the statute and Guidances, coupled with the aforementioned New Jersey case law stating that the Treasurer has broad authority to implement the Act, leads me to reject Retail Merchant's argument.

Finally, Treasury Guidance dated September 25, 2010 also "exempt[s] issuers and holders from the requirement that the name and address of the purchaser be maintained *so long as the purchaser's zip code is obtained*." Treasury Guidance dated Sept. 23, 2010 at 3 (emphasis added). This interpretation is consistent with the express language of Chapter 25.  Chapter 25 provides that "[a]n issuer of a stored value card shall obtain the name and address of the purchaser or owner of each stored value card issued or sold and *shall, at a minimum, maintain a record of the zip code of the owner or purchaser.*"  Chapter 25, § 5c (emphasis added).

For the foregoing reasons, I conclude that the Treasurer's Guidances are consistent with New Jersey's Unclaimed Property Act and, therefore, constitute reasonable administrative interpretations entitled to deference under New Jersey law.[29]  Having clarified the legal import of the Guidances,

---

[29]     The Court notes the SVC Plaintiffs' invitation to view the Guidances as an admission that Chapter 25 was erroneously drafted.  As is apparent from the my analysis of Chapter 25's priority scheme, the statute facially violates Texas.  However, I need not view the Guidances as such

I now turn to whether the priority scheme created by the Guidances and Unclaimed Property Act are preempted by federal common law.

### (iii)    Preemption of Guidances

Having concluded that the Guidances embody reasonable interpretations of the statute, I must now address whether the Guidances themselves are preempted by the Texas line of cases. As noted, it is the State's argument that the Guidances remedy any constitutional infirmity found in Chapter 25 in two ways. With respect to the secondary rule, the State argues, the Guidances properly acknowledge the right of the debtor's State of incorporation to escheat. And, if the debtor's state of incorporates does not escheat SVCs, Texas does not preclude New Jersey from applying a place-of-purchase presumption. Because Texas does not address the circumstance in which the debtor's state of incorporation does not escheat the intangible personal property owned by the creditor, so the State's argument goes, New Jersey may create a "third priority rule" under which it temporarily holds the property until the creditor's address becomes apparent and the creditor's state asserts its superior right to escheat. The State's second argument is that, because the Guidances require that the purchaser's or owner's zip code will be maintained on a going-forward basis, the place-of-purchase presumption will never apply prospectively.

The State is correct that Texas does not explicitly address what happens when the debtor's State of incorporation does not escheat the particular intangible property at issue. Texas merely held that the debtor's State of incorporation had "the *right* to escheat." Id. (emphasis added). Indeed, state courts have held that Texas applies only when two states affirmatively seek to escheat the same property. See e.g., Riggs Nat. Bank v. District of Columbia, 581 A.2d 1229 (D.C. App. 1990);

---

an "admission," rather than a fleshing out of the statute.

O'Connor v. Sperry & Hutchinson Co., 379 A.2d 1378 (Pa.Cmwealth. 1977); Liquidating Trustees of Republic Petro Co., 510 S.W.2d 311 (Tex. 1974). These cases reason that Texas does not apply when no state seeks to escheat under either the primary or secondary rule, yet a third state intends to serve as custodian of the abandoned assets. See TXO Prod. Corp. v. Oklahoma Corp. Comm'n, 829 P.2d 964, 971 (Ok. 1992) ("Nothing in Texas prohibits a state from claiming temporary custody of unclaimed property until some other state comes forward with proof that it has a superior right to it."); O'Connor, 379 A.2d at 605 ("It is apparent in our view that the Court meant its rule to be binding only where there were multiple claims to the same property. Moreover, we believe it equally clear that the Court did not decide whether any other state would have rights next in line to those it considered because it believed either one of those states would be willing and able to escheat.").

While this rationale has some facial appeal, it does not withstand more careful examination. Consider the following hypothetical. Owner, a resident of Arizona, visits her cousin who lives in New Jersey. While visiting there, she purchases a gift card from an SVC issuer that is incorporated in Maryland and the issuer retains her zip code. At first blush, the primary rule would appear to apply because the Owner's last known address is known. However, the secondary rule applies not only "where the last known address of the owner is unknown," but also when the owner resides "in a state that does not provide for escheat of the property owed ...." Delaware, 507 U.S. at 499. In that instance, "the State in which the debtor is incorporated is awarded the right to escheat ...." Id. So, under the secondary rule, the SVC issuer's state of incorporation, Maryland, would be entitled to escheat because Arizona, the state of the owner, does not escheat SVCs. Herein lies the rub: neither Maryland nor Arizona escheats SVCs, thereby resulting in the abandoned property being left in the hands of the issuer.

75

The state court rulings view such a "private escheat" as antithetical to the goals of the Texas priority scheme.  In their view, the state of purchase is a better custodian on behalf of the rightful owner.  "By taking temporary custody of the unclaimed proceeds from a private holder, [the State] does not divest any state with a constitutional priority claim of custody or title to the funds. The public policy supporting custodial taking by a State is superior to any claim that a private holder may assert to any unclaimed proceeds."  TXO, 829 P.2d at 972.  Further, these cases reason, the state of purchase will turn over the funds to a state with a higher priority should either of those states submit a claim.

This rationale does not apply, however, when neither the primary nor secondary state escheats.  In such an instance, no claim will be made for the funds and they will remain in the coffers of the state of purchase.  The only conceivable circumstance in which a claim could be made is if either the creditor's state of last known address or the debtor's State of incorporation subsequently amends its laws to provide for escheat.  But, the State here has pointed to no reason why it should be permitted to hold the property until that unlikely possibility occurs, if at all.

I find the decision in TXO instructive in this regard.  In construing an Oklahoma statute that permitted the custodial escheat of pooled mineral interests located in Oklahoma, the TXO Court interpreted it in such a way as to preserve its constitutionality under the Texas line of cases.  The court reasoned:

> The legislature's failure to include the Texas guidelines in the UPMA is not fatal to its validity. Texas was decided in 1965. Its effect on the custodial taking of intangible property was well established by 1983, when the UPMA was passed, and in 1984, when the Uniform Act was amended to include custodial taking of monies owed to unknown mineral interest owners. The legislature presumably considered Texas' impact on the statutory scheme when drafting these acts and intended to conform them to the Texas guidelines ....

Because the court concluded that the Oklahoma legislature intended its statute to conform with

Texas, the TXO Court arrived at the following constitutional interpretation of the statute:

> [the statute] intended to allow Oklahoma to seize unclaimed monies
> belonging to (a) owners of forced pooled oil and gas interests with a
> last known address in Oklahoma, (b) owners with no known address
> where the holder is domiciled in Oklahoma, or (c) owners whose last
> known address is in a state with no custodial taking or escheat
> provisions *and the holder's domicile is Oklahoma*.

829 P.2d at 970-71 (emphasis added).  Important here is the TXO Court's recognition that a state

may serve as a "temporary custodian" only where the holder is incorporated in that state.  In other

words, there is no room for a third priority position.  If the secondary-rule state does not escheat, the

buck stops there. In contrast to the Oklahoma statute, the plain language of Chapter 25 and the

Guidances preclude this Court from construing New Jersey's law to conform with the federal

common law.  Cf. Amer. Petrofina Co. of Texas v. Nance, 697 F.Supp. 1183, (W.D. Okl. 1986) aff'd

859 F.2d 840 (10th Cir. 1988).[30]

Accordingly, in my view, when current state laws do not provide for escheat in the primary

and secondary-rule states, there is no indication in Texas that the state of purchase—"a forum having

no continuing relationship to any of the parties to the proceedings"— has the right to retain the

property.  Delaware, 507 U.S. at 504 (citing Pennsylvania, supra at 213).  "Texas and Pennsylvania

---

[30]     In a thorough decision, the Nance Court reasons that "[t]he Supreme Court's decision
in Texas v. New Jersey, may be relied upon to prevent state officials from enforcing a state law in
conflict with the Texas v. New Jersey scheme for escheat or custodial taking of unclaimed property,
because the decision was rendered as a result of the Supreme Court exercising its original
jurisdiction and to ensure uniformity."  697 F.Supp. at 1187 (citing State v. Amsted Indus., 48 N.J.
544 (1967)).  Based on this legal conclusion, the court ruled that a 1984 Oklahoma law conflicted
with the Texas scheme by " ignor[ing] the right of another state to recover property when the state
within which there is a last known address has no law governing the custody or escheat of unclaimed
property."  Id.

. . . [mandate] that only a State with a clear connection to the creditor or the debtor may escheat," Id., and "no State may supersede them by purporting to prescribe a different priority under state law." Id. at 500.  In addition, I find it telling that, in fashioning the Texas rules, the Supreme Court expressly stated that the secondary rule applied when the law of the primary rule state "do[es] not provide for escheat."  Delaware, 507 U.S. at 500.  That it made no similar concession in connection with the secondary rule further suggests that no third priority was envisioned by the Court.  This is not to say that the Supreme Court may not create a third priority rule at some future date.  My point here is that is not the province of New Jersey to create that rule.

There are several other indications in the Texas line of cases that the Supreme Court intended its priority rules to be exclusive and exhaustive.  Turning first to the Texas decision itself, Texas considered several rules proposed by the States to determine which one State had the right to escheat in any given case.  Although the Court recognized the attractiveness of several of the proposed rule schemes, it chose only one scheme.  That the Court found it necessary to choose only one scheme suggests that it did not intend for the scheme to be altered.  In this connection, the Court explicitly noted that

> We realize that this case could have been resolved otherwise, for the issue here is not controlled by statutory or constitutional provisions or by past decisions, nor is it entirely one of logic. *It is fundamentally a question of ease of administration and of equity. We believe that the rule we adopt is the fairest, is easy to apply,* and in the long run will be the most generally acceptable to all the States.

379 U.S. at 683 (emphasis added).

Permitting the creation of a third priority rule, as the State suggests, would necessarily complicate the priority scheme the Supreme Court designed for ease of administration and would run afoul of Texas' bright-line-demarcation rules.  Moreover, as Plaintiff AMEX Prepaid argues,

78

the State has not indicated how the Supreme Court's priority scheme would work in the event different states enacted incompatible third priority rules. Incompatible third priority rules would unquestionably undermine the Supreme Court's focus on ease of administration.

To be sure, the Supreme Court rejected such case-by-cases analyses in developing the priority scheme, reasoning:

> The uncertainty of any test which would require us in effect either to decide each escheat case on the basis of its particular facts or to devise new rules of law to apply to ever-developing new categories of facts, might in the end create so much uncertainty and threaten so much expensive litigation that the States might find that they would lose more in litigation expenses than they might gain in escheats.

Id. at 678. And, the Texas Court's comment that "the States separately *are without constitutional power to provide a rule to settle this interstate controversy* ...." buttresses my conclusion that Texas leaves no room for such alterations. Id. at 677 (emphasis added).

Language in Delaware confirms my reading of Texas. Most explicitly, Delaware states that the Texas priority rules arise from the Supreme Court's authority and "[n]o state may supersede them by purporting to prescribe a different priority under state law." Delaware, 507 U.S. at 500. In describing the secondary rule, the Court expressed that "the secondary rule protects the interests of the debtor's State *as sovereign over the remaining party* to the underlying transaction" Id. at 504 (emphasis added). In my view, inherent in the State's sovereignty is its choice *not* to exercise custodial escheat over SVCs. To rule otherwise, would permit other states, such as New Jersey, to supplant their choice for that of the debtor's state of incorporation.[31]

---

[31]    In this connection, Retail Merchants additionally argues that the Full Faith & Credit Clause would be violated to the extent that New Jersey failed to give full effect to another state's choice not to escheat SVCs. However, while that clause requires states to recognize the validity of the legislation of other states, it does not mandate uniformity in state legislation. See Adkins v.

Also, the Supreme Court's "sovereign over the remaining party" language calls to memory the historical, jurisdictional basis for escheat.  For tangible property, it is the location of the *res* in its borders that grants a state jurisdiction to escheat.  For intangible property, it is the legal fiction that the property follows the owner that forms the basis for the "last known address" primary rule. See Texas, 379 at 681.  Hence, the Supreme Court affirmed the Texas priority scheme in Delaware to avoid having "intangible property rights. . . cut off or adversely affected by state action . . . in a forum having no continuing relationship to any of the parties to the proceedings." 507 U.S. at 504 (citation omitted).  New Jersey's proposed priority rule would do exactly what the Supreme Court sought to prevent.  It would permit New Jersey to fabricate an interest where it otherwise does not have one by presuming that the place of purchase is the creditor's last known address, and by usurping the right of the debtor's state of incorporation to rule over the debtor.  This is particularly true in the case of internet sales, where the only connection to New Jersey may be that the SVC issuer is authorized to do business in New Jersey even though incorporated elsewhere.

If, as the State concedes, the Supreme Court decisions constitute federal common law entitled to preemptive force under the Supremacy Clause, there can be no basis for importing an exception into the federal law.  Such a result would turn preemption analysis on its head by defining the federal law in light of state interests.  Moreover, contrary to the implication of the State's argument, the parties in the Supreme Court decisions included  corporate holders—not just states.  See e.g., Texas, supra at 675 (listing Sun Oil Company as a party); Western Union, 379 U.S. at 72 (listing Western

Rumsfeld, 464 F.3d 456, 467 (4th Cir. 2006).  Nor does it require a state to defer to another's states more limited statutory provisions in every circumstance.  See Garcia v. American Airlines, Inc., 12 F.3d 308, 312 (1st Cir.  1993) (citing Thomas v. Washington Gas Light Co., 448 U.S. 261, 278 (1980)).  Hence, I decline to rest a preliminary injunction ruling on this basis.

Union as party).  It is true that the Supreme Court's original jurisdiction was premised on the dispute between state parties, but to say that the Court's substantive decision is limited to state parties confuses jurisdiction with merits.

Furthermore, and as noted supra, by stating that the place of purchase may be substituted for the owner's address, the Act explicitly authorizes what the Supreme Court's priority rules disallow. This is a quintessential indicator of conflict, if not express, preemption.  The Supreme Court took pains in both Pennsylvania, supra, and Delaware to make clear that a last known address presumption based upon place of purchase is inappropriate.

For the sake of completeness, I address a few remaining arguments by the parties.  The parties argues over whether the Unclaimed Property Act sufficiently insulates, through indemnification, the SVC issuer from the potential for multiple liability to more than one state. Whether or not New Jersey law partially or fully indemnifies the issuer would not alter my analysis because I conclude that Chapter 25 is preempted by federal common law.

Furthermore, two additional points must be made.  First, the Guidance language implements the secondary rule under Texas applies only retroactively.  As noted, the Guidance explicitly states that it applies to SVCs "issued prior to the date of this announcement ....", which was September 23, 2010.  That it applies only retroactively does not affect my ultimate conclusion because both the plain language of Chapter 25 and the Guidance are preempted by the federal common law.  Second, the Guidance language directing that SVC issuers retain zip codes has no effect on my analysis.  The plain language of the statute already directs that zip codes must be maintained "at a minimum." Chapter 25, § 5c.

Finally, Plaintiff Retail Merchants argues that it is often impossible to determine the "true

creditor" in the SVC context because, though a card is purchased by one party, that party may give the card to a third party and it is the physical possessor of the card that is entitled to redeem it. Indeed, it is the possessor of a gift card that is entitled to redeem it because it is most akin to a bearer obligation.  See Mann v. TD Bank, N.A., No. 09-1062, 2010 WL 4226526, *9 (D.N.J. Oct. 20, 2010).  However, I do not find this argument relevant because the Supreme Court has made clear in Pennsylvania, that a holder's failure or inability to obtain the last known address of the owner is of no moment. 407 U.S. at 214-15.  Like the SVC issuers here, Western Union did not routinely collect the owner's address information.  Id. at 209.

In sum, Chapter 25 creation of a place-of-purchase presumption when the last known address or zip code of a stored value card purchaser/owner is unknown is preempted by the federal common law set forth in the Texas line of cases.  The Treasury Guidance sets forth a reasonable interpretation of Chapter 25, by construing it in conjunction with the general provision of New Jersey's Unclaimed Property Act and the UUPA such that the place-of-purchase presumption applies retroactively only when the debtor's State of incorporation does not escheat SVCs.  But this language is also preempted by the Texas line of cases.  Thus, for the foregoing reasons, I conclude that the SVC Plaintiffs have demonstrated a likelihood of success on their preemption claim, with respect to both retroactive and prospective application of the statute and Guidances.  The State shall be preliminarily enjoined from applying the place-of-purchase presumption in the Act to SVCs.

### 3.    Substantive Due Process

The SVC Plaintiffs' substantive due process argument centers on whether the legislature had a legitimate state interest in enacting Chapter 25.  For the same reasons expressed in connection with my analysis of travelers checks, I conclude similarly that the SVC Plaintiffs have failed to

demonstrate a likelihood of success on their substantive due process claim.

### 4.     Contracts Clause

As with Travelers Checks, those SVC Plaintiffs that sell prepaid SVCs redeemable for cash have not demonstrated a likelihood of success on their Contract Clause claim. These plaintiffs have not pointed to any express or implied contractual obligation between themselves and prepaid SVC purchasers that is impaired by Chapter 25. Without meeting this threshold inquiry, their Contract Clause claim may not proceed.

Those SVC Plaintiffs that issue gift cards, however, have demonstrated a likelihood of success on their Contract Clause claim. The effect of Chapter 25 on these plaintiffs is unique because, by operation of the statute, the issuers are required to transfer the entire face value of the gift card to the state for custody upon abandonment even though gift cards are not redeemable for cash. In addition to the added accounting burden of converting the gift card value to cash, this works a harm upon the issuers because if the owner fails to ever present the card to the issuer, but instead files a claim with the state, the issuer will be removed entirely from the transaction and lose its profit. Conversely, if a gift card owner fails to present the card to the issuer post-abandonment, and never files a claim with a state, the issuer will also not recover its profit in that circumstance. Under either scenario, the issuer is deprived of its right to earn a profit in connection with the gift card sale and redemption.[32]

---

[32]     That some gift card issuers issue the cards through a subsidiary, see Rowe Afft., ¶ 4, does not alter the affect of an unredeemed or unclaimed card on the issuer's profits.

In addition, the State cites to Rowe Afft., ¶ 17, arguing that the gift card issuers realize their profit "at the time the Gift Card is redeemed ...." and, therefore, at the time of abandonment, the gift issuer is not required to transfer over its profits. Def. Opp. to Pl. Ret. Merch.OTSC at 36. I reject the State's interpretation of Mr. Rowe's statement. Read in context, his

Plaintiff AMEX Prepaid asserts that it issues many "open loop" cards that are not redeemable for cash.  Happ. Decl. at ¶ 5.[33]  Plaintiff Retail Merchants assert that its members "issue retail gift cards that are usable solely to purchase goods and services from the issuing retailer's location."  Rowe Afft. at ¶ 3.  Plaintiff Food Council asserts that its members issue "merchandise-only" cards, which are not redeemable for cash.  Watson Decl. at ¶ 5.  For these plaintiffs, then, the threshold Contract Clause inquiries are easily met—the gift card issuers have pointed to contractual agreements between themselves and gift card owners providing that the cards may be redeemed only for goods o r services; Chapter 25 impairs that contractual relationship by requiring the gift card issuers to transfer their profit to state custody; and this impairment is substantial because the issuers will permanently lose their profits if the gift card owner never claims or redeems the card post-abandonment.

Having concluded that the challenged act works a substantial impairment, the next question is "whether the law at issue has a legitimate and important public purpose." Transport Workers, 145 F.3d at 621.  It is undisputed that custodial escheat is generally a legitimate public purpose.  But, for Contract Clause purposes, my analysis may not end there.  I must also consider "whether the adjustment of the rights of the parties to the contractual relationship was reasonable and appropriate in light of that purpose." Id.  Here, the gift card issuers have met their burden in demonstrating that Chapter 25's requirement that they transfer their profits to the State is unreasonable.  Many  other

statement merely indicates that the gift card issuer realizes its profits *on its books* once the card is redeemed.

[33]    The Court notes that AMEX Prepaid has not pointed to any specific contract provision, between itself and gift card purchasers, stating that the cards are not redeemable for cash. However, the State does not dispute that such a provision exists.

states that escheat gift cards make an accommodation for the issuer's profits,[34] and the State has not pointed to any justification for its impairment of this contractual right. Rather, the State cites generally to cases stating that banks and similar holders of funds on account of an owner do not possess a contractual right impaired by the Contract Clause. See e.g., Standard Oil, supra at 436. While the reasoning of these cases are applicable to the Court's analysis regarding travelers checks, supra, these cases are inapposite here; these cases involve cash whereas here, the card issuers are obligated to provide only merchandise or services. The gift card issuers have, thus, demonstrated that their right to earn and retain their profit is substantially impaired by the statute. Accordingly, I conclude that the gift card issuing SVC Plaintiffs have demonstrated a likelihood of success on their Contract Clause claim, and hereby enter a preliminary injunction enjoying the application of Chapter 25 to issuers of gift cards, retroactively, to the extent that the legislation affects existing contracts between gift card issuers and purchasers/owners.[35]

This preliminary injunction does not preclude the prospective application of the statute to gift card issuers. Chapter 25 is unconstitutional only to the extent that it affects existing contracts. Troy Ltd. v. Renna, 727 F.2d 287, 296-99 (3d Cir. 1984) (describing contract clause as impairing existing contracts); Pennsylvania Mortg. Bankers Ass'n v. Zimmerman, 664 F.Supp. 186, 194 (M.D.Pa. 1987) ("The . . . contract clause does not apply to prospective state action."). This may include a gift card

---

[34]    Similarly, the UUPA's gift certificate provision escheats only at 60% of the face value.

[35]    Additionally, Plaintiff Food Council argues that the escheat of its profit violates the derivative rights rule under the New Jersey state constitution, contending that a state may not escheat greater rights than those held by the rightful owner. In light of my Contracts Clause ruling in Food Council's favor, I need not reach this state constitutional issue. Similarly, I need not reach Food Council's argument under the manifest injustice clause of the New Jersey state constitution.

issued one year ago, that could be presumed abandoned a year following the effective date of the statute. But, gift cards issued after the effective date of the statute are not entitled to Contract Clause protection. This result makes sense because the Contract Clause protects existing contracts entered into with legitimate expectation based upon law in effect at the time of contracting. No party may legitimately expect that the law will remain static. Going forward, gift card issuers may alter their contracts or choose to cease issuing cards in the State of New Jersey altogether if they find the issuance no longer profitable.

     **5.**    **Takings Clause**

With respect to gift card issuers, the analysis again differs from that for travelers checks and prepaid SVCs. Unlike the cash-for-cash exchange inherent in the latter type of transactions, gift cards are not redeemable for a dollar value and issuers of gift cards necessarily include their profit margin in the cost of the SVC. So, when the gift card issuer transfers the proceeds of abandoned gift cards to the state, the issuer is forced to transfer its profit as well.

Contracts are a form of property and, therefore, are protected property interests under the Fifth Amendment. Prometheus, 373 F.3d at 430 (citing United States Trust, 431 U.S. at 19 n. 16).[36] I conclude in my Contracts Clause analysis that the gift card issuers have a contractual right to honor the cards for only merchandise or services. Accordingly, the gift card issuers profit may also

---

[36]    The SVC Plaintiffs also rely upon the state court decision in Service Merch. Co., Inc. v. Adams, No. 97-2782-III, 2001 WL 34384462 (Tenn. Ch. Jun.29, 2001), which reasoned that requiring a gift card issuer to deliver cash to the state constitutes a taking. That court based its takings clause analysis upon the Supreme Court's decision in Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992). Because I read the Supreme Court's decision in Lucas as specific to takings of real property, I decline to adopt the Service Merch. Court's analysis here. See Unity Real Estate Co. v. Hudson, 178 F.3d 649, 674-75 (3d Cir. 1999).

constitute a property interest for Takings purposes.

The State, nonetheless, argues that any escheatment of the gift card issuers' profit is not a taking, but only a temporary deprivation because the issuer may apply for reimbursement from the State in the event that the owner redeems the gift card post-abandonment.  But the takings problem for the gift card issuer is that Chapter 25 makes no provision for the issuer to recover its profits in the event the gift card owner does *not* use the card after the abandonment period.  As noted, if the owner fails to present the card to the issuer, but instead files a claim with the state, the issuer will be removed entirely from the transaction and lose its profit.  And, if a gift card owner fails to present the card to the issuer post-abandonment, and never files a claim with a state, the issuer will not recover its profit in that circumstance.  Under either scenario, the issuer is deprived of its contractual right to earn profits in connection with the gift card sale and redemption.  In this way, Chapter 25 could conceivably effect a taking of the gift card issuer's profits.  However, The Court need not rest its decision to grant a preliminary injunction on this Takings claim in light of the foregoing Contracts Clause analysis.

C.     **Commerce Clause**

As the arguments made by all Plaintiffs regarding violations of the Commerce Clause are similar, the Court will address them in this section.  The Commerce Clause of the United States Constitution grants Congress the authority to "regulate Commerce...among the several States." U.S. Const. Art. 1, § 8, cl. 3.  To state a claim under the Commerce Clause, a plaintiff must demonstrate that the challenged state regulation "has extraterritorial effects that adversely affect economic production (and hence interstate commerce) in other states" or "the object of the law is local economic protectionism, in that it disadvantages out-of-state businesses to benefit in-state ones."

87

Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd., 462 F.3d 249, 261-62 (3d Cir. 2006) (alterations and quotations omitted).  Alternatively, a plaintiff may state a claim by demonstrating that "the burden imposed on [out-of-state] commerce is clearly excessive in relation to the putative local benefits." Id. at 263.  The Commerce Clause also has an implied requirement—called the "dormant" Commerce Clause—that limits the power of the states to discriminate against interstate commerce by forbidding "'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" Cloverland-Green, 462 F.3d at 261(quoting Granholm v. Heald, 544 U.S. 460 (2005)).

More particularly, state regulations may burden interstate commerce "when a statute (i) shifts the costs of regulation onto other states, permitting in-state lawmakers to avoid the costs of their political decisions, (ii) has the practical effect of requiring out-of-state commerce to be conducted at the regulating state's direction, or (iii) alters the interstate flow of the goods in question, as distinct from the impact on companies trading in those goods." Brown & Williamson Tobacco Corp. v. Pataki, 320 F.3d 200, 208-09 (2d Cir. 2003) (citations omitted); see also Pac. Northwest Venison Producers v. Smitch, 20 F.3d 1008, 1015 (9th Cir. 1994) (reviewing types of burdens such as "disruption of travel and shipping due to lack of uniformity of state laws," "impacts on commerce beyond the borders of the defendant state," and "impacts that fall more heavily on out-of-state interests.").

By contrast, courts will uphold a nondiscriminatory statute that affects interstate commerce only incidentally, "unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970). To prove that a state law is either per se invalid or fails the Pike balancing test, a plaintiff must at least show that the

law has a "disparate impact" on interstate commerce. Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc., 155 F.3d 59, 75 (2d Cir. 1998); see also Freedom Holdings Inc. v. Spitzer, 357 F.3d 205, 218 (2d Cir. 2004).

Plaintiffs claim that the implementation of Chapter 25 violates the Commerce Clause because Chapter 25 forces Plaintiffs to alter their business models, which include interstate sales and marketing terms. Essentially, Plaintiffs argue that Chapter 25 would negate Plaintiffs' ability to engage in a uniform interstate marketing and sales program. In addition, Plaintiffs maintain that the alternative of charging a fee for travelers checks sold throughout the United States, including in New Jersey and other states, would burden interstate commerce by permitting New Jersey to dictate the operation of Plaintiffs' sales model. For support, Plaintiffs rely on the Supreme Court's decision in Healy v. Beer Institute, Inc. , 491 U.S. 324, 336 (1989) and Brown-Forman Distillers Corp., v. N.Y. State Liquor Authority, 476 U.S. 573, 582 (1986). However, these cases do not help Plaintiffs' position.

Plaintiffs attempt to analogize Chapter 25 to regulations the Supreme Court held unconstitutional. In Healy and Brown-Forman both cases concerned state laws that pegged the in-state prices of liquor or beer to prices charged outside the states in question. See Healy, 491 U.S. at 326-27 (describing Connecticut's beer price-affirmation statute); Brown-Forman, 476 U.S. at 575-76 (describing New York's Alcoholic Beverage Control Law). Although the statutes at issue in those two cases differed, each had "the undeniable effect of controlling commercial activity occurring wholly outside the boundary of the State." Healy, 491 U.S. at 337. In Brown-Forman, the Court found that New York had "project[ed] its legislation into other States" by effectively requiring distillers to seek the approval of the New York State Liquor Authority before lowering prices

89

elsewhere. 476 U.S. at 583-84 (internal quotation marks omitted). Likewise, in <u>Healy</u>, the Court observed that Connecticut had "require[d] out-of-state shippers to forgo the implementation of competitive-pricing schemes in out-of-state markets because those pricing decisions are imported by statute into the Connecticut market regardless of local competitive conditions." 491 U.S. at 339. Holding both statutes unconstitutional, the Supreme Court warned that "States may not deprive businesses and consumers in other States of 'whatever competitive advantages they may possess' based on the conditions of the local market." <u>Id.</u> (quoting <u>Brown-Forman</u>, 476 U.S. at 580).

Here, on this motion, Plaintiffs fail to show that they are likely to win on the merits based on the Commerce Clause. Absent from Plaintiffs' reasoning is how the effects of Chapter 25 might be projected into other states. Unlike the price-affirmation laws in <u>Healy</u> and <u>Brown-Forman</u>, Chapter 25 does not by its terms or its effects, directly regulate sales of store valued cards and travelers checks in other states. Nor does it prevent other states from regulating store valued cards or travelers checks differently within their own territories. Nevertheless, Plaintiffs argue that Chapter 25 operates as an extraterritorial restriction because it forces the costs of compliance onto out-of-state consumers. However, in the context of a state regulating gift cards specifically, the Second Circuit has opined that it does "not agree that out-of-state consumers must inevitably be the ones to bear such costs" so as to violate the Commerce Clause. <u>SPGGC, LLC v. Blumenthal</u>, 505 F.3d 183, 196 (2d Cir. 2007). Instead, any compliance costs could be passed on to New Jersey consumers or else be absorbed by Plaintiffs in the form of lower profits. Indeed, "simply because a state regulation would force the regulated manufacturers to bear some of its costs, it does not automatically violate the Commerce Clause." <u>Nat'l Elec. Mfrs. Ass'n v. Sorrell</u>, 272 F.3d 104, 111 (2d Cir. 2001).

Accordingly, Plaintiffs have failed to show a likelihood of success on their Commerce Clause claim.

## VI.    Remaining Preliminary Injunction Factors

In addition to whether the movant has shown a reasonable probability of success on the merits, the remaining preliminary injunction factors are:  (1) whether the movant will be irreparably injured by denial of the relief; (2) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (3) whether granting the preliminary relief will be in the public interest. Crissman, 239 F.3d at 364.  Because Amex has not show a likelihood of success with respect to any of its claims, the Court need not address the remaining factors in connection with its motion.  As such, Amex's motion is denied.  Morton v. Beyer, 822 F.2d 364, 371 (3d Cir. 1987) ("[A] failure to show a likelihood of success . . . must necessarily result in the denial of a preliminary injunction.")

With respect to the SVC Plaintiffs, this Court has concluded, supra, that they have shown a likelihood success on their on their Texas based preemption argument regarding Chapter 25's place of purchase presumption.  These plaintiffs, further, argue that they will suffer irreparable harm if required to comply with the law.  Were this Court to deny their request for a preliminary injunction, and permit the statute to be enforced, the SVC issuers would face threat of prosecution if they chose not to expend the large amounts of funds necessary to comply with the statute's prospective and retroactive reporting requirements—funds they would not to be entitled to receive back if the statute is later found unconstitutional.  For gift card SVC issuers, in particular, they contend that the same holds true for the profits they must remit under the statute.  I agree that these bases sufficiently demonstrate irreparable harm.  See ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3d Cir. 1987) (stating that irreparable harm is shown where the harm is "of a peculiar nature, so that compensation

in money cannot atone for it."). In addition, "that the [SVC Plaintiffs] will suffer an immediate irreparable harm is buttressed by my finding that the [statute] is unconstitutional. Courts have found that 'an alleged constitutional infringement will often alone constitute irreparable harm." Accord Association for Fairness in Business, Inc. v. New Jersey, 82 F.Supp.2d 353, 359 (D.N.J. 2000) (citing Monterey Mechanical Co. v. Wilson, 125 F.3d 702, 715 (9th Cir. 1997)).

Further, in the context of a motion for preliminary injunction, the Government does not have an interest in the enforcement of an unconstitutional law, and the public interest is not served by the enforcement of an unconstitutional law. ACLU v. Ashcroft, 322 F.3d 240, 247 (3d Cir. 2003). Thus, granting the preliminary injunction will not result in any harm to the State. Finally, the public's interest is not served by enforcing unconstitutional laws. Accordingly, in balancing the interests, I conclude that the remaining preliminary injunction factors have been satisfied.

## VII.   Conclusion

Accordingly, having balanced the injunction factors, the Court enjoins the State of New Jersey from enforcing the place-of-purchase presumption found in Chapter 25 – subsection 5c – and Guidances issued by the Treasurer. The Court further enjoins the State from enforcing Chapter 25 retroactively against issuers of stored value cards with existing stored value card contracts that obligate the issuers to redeem the cards solely for merchandise or services.

DATED:  November 13, 2010                    /s/ Freda L. Wolfson
                                             FREDA L. WOLFSON
                                             United States District Judge